### SHOOK v. ILLINOIS CENT. R. CO.

(Circuit Court of Appeals, Fifth Circuit. April 22, 1902.)

No. 1,122.

1. MASTER AND SERVANT—RELEASE FOR INJURIES—FRAUD—EVIDENCE—SUFFICIENCY.

Where an employé, a few months after being injured, executed a release, and afterwards became insane from wounds in his head, and defendant, in an action for injuries, pleaded the release in bar, an averment that plaintiff in his mentally weak condition, by false and misleading statements by defendant's surgeon, was kept in ignorance of his true condition, and by feigned promises of employment was induced to execute the release for an inadequate consideration, is not sustained, in the absence of positive testimony on such issue, where it appears that he was restored to his employment, and at the time the release was signed the injuries to plaintiff's brain from the wounds in his head were not known to the defendant's surgeon.

2. SAME—QUESTIONS FOR JURY—DIRECTING VERDICT.

An employé received wounds in his head, which injured his brain, and subsequently produced insanity. After the accident his mental temperament was changed from that of a kind and considerate man to one of seemingly clouded intellect and irritable disposition. After the injuries he resumed his employment as a locomotive engineer without showing any incapacity for the service, and executed a release to the company for his injuries. The testimony as to his mental condition when he executed the release and as to whether the injury to the brain was in contemplation of the parties was conflicting. The company's physician, who examined him shortly after the accident, did not examine his head.

stating the wounds there were merely scalp wounds. He continuously suffered from pains in his head until he was adjudged insane, about three years after the accident, and continued his employment for over two years, when he was discharged for disobedience of the company's rules. *Held*, that the issues as to such employé's sanity at the time he executed the release, and, if he was mentally sound, whether the injuries to his brain were in the contemplation of the parties, were, under the evidence for the jury, and it was error to direct a verdict for defendant.

In Error to the Circuit Court of the United States for the Northern District of Mississippi.

This action was brought by the plaintiff in error, George A. Shook, a person of unsound mind, by his wife, Mary G. Shook, as guardian and next friend, against the Illinois Central Railroad Company, the defendant in error. The declaration is in the common form. The answer, in addition to the general issue, presented a special plea in confession and avoidance, which, in effect, was a plea of accord and satisfaction, setting up a written release. The release was not attached to the plea, but is shown by the evidence to have been literally as follows:

"The Illinois Central Railroad Company to George A. Shook, Engineer, Dr.

"Address: Water Valley, Miss. (General Voucher. Voucher No. ——. Month of ——, 18—.) Charge to Per. Inj., Miss. Div., 140.00.

"In full payment, satisfaction, and discharge of all claims, demands, and rights of action whatsoever, in any wise connected with or arising out of personal injuries sustained by the said George A. Shook on or about November 22, 1896, at or near Water Valley, Mississippi (Mississippi division), while employed as engineer in service of the Illinois Central Railroad Company he sustained injuries by jumping from engine No. 863 to avoid collision, and in release of all claims for all injuries then and there received, however caused, 140.00. Voucher made Jan. 27th, 1897.

"I certify that I have examined all extensions, additions, and calculations in this account, and that they are correct.

"W. S., 1/29, Clerk.

"I certify that the above account has not been previously paid.

"J. M., 1/29, Clerk.

"Certified correct: A. W. Sullivan, Genl. Supt.

"Correct: L. L. Losey, Chief Claim Agent.

"Audited for $140.00: J. W. Anderson, Auditor of Disbursements.

"Approved for payment: J. C. Welling, Vice President.

"Approved: J. T. Harahan, 2nd Vice President.

"Received of the Illinois Central Railroad Co., Mch. 4, 1897, one hundred and forty $^{00}/_{100}$ dollars in full of above account.     G. A. Shook.

"Illinois Central R. R. Company, Southern Division. New Orleans, 12 Febry., 1897. No. 19,946. $140. Canal Bank: Pay to the order of Geo. A. Shook ($140.00) one hundred forty and no/$_{100}$ dollars.

"R. S. Charles, Local Treasurer.

"Indorsed: Geo. A. Shook."

To this plea the plaintiff replied (omitting the formal parts) as follows: "Plaintiff says it is not true that he executed a release from all damages for the injuries sustained by him mentioned in his declaration filed in this cause on the 4th day of March, 1897. It is not true that plaintiff was of sound mind, and capable of executing such release as is by the defendant pleaded, on the 4th day of March, 1897." By a second additional replication the plaintiff averred: "That at the time when said supposed release is alleged to have been executed he was bruised and sick and sore, and mentally and physically weak, and unable to attend to his business as he was accustomed to do, and was unable to appreciate the meaning of his action in the execution of such paper as that pleaded by the defendant, nor was he able to comprehend his condition physically or mentally, nor to understand the full extent of his injuries complained of in his declaration herein filed; and, being in such a condition physically and mentally, he was misled and deceived by the phy-

sician and surgeon of the defendant, who was also its agent and employé, and who was also the only physician who at that time had examined the plaintiff, and who repeatedly stated to him (the plaintiff) that he was not seriously hurt, and that he would soon be well and entirely cured of his wounds, when in truth and fact he (the plaintiff) was seriously and permanently injured, and in such a way as to cause him to become violently insane, all caused by the injuries sustained by him and complained of in his declaration aforesaid, his head being broken and his skull depressed so that it rested on his brain, which fact was unknown to him at the time of the alleged execution of the release pleaded by defendant; wherefore, by the false and misleading statements of the defendant's agent and surgeon, plaintiff, in his mentally weak condition, was kept in ignorance of his rights in the premises and of his true condition, and was, by means of false and feigned promises of employment made to him by the defendant, induced to sign said alleged release for a grossly inadequate consideration, and said release was made broad enough in its terms to cover all damages sustained by this plaintiff, when in truth and in fact the damages to his head and brain were unknown to him, he being kept in ignorance thereof by the repeated statements of defendant's surgeon and employé, as aforesaid, and were not contemplated by him at the time of said alleged release, and were not intended to be and were not included in the settlement then and there made with the said defendant, evidenced by the release pleaded by it in its second plea."

The usual proceedings were had. The case came on for hearing before a jury. When the testimony was all in, counsel for the defendant moved the court to charge the jury peremptorily to return a verdict for the defendant; and, after hearing the argument of the counsel for both sides, the court gave the jury a peremptory instruction to return a verdict for the defendant, to which action of the court the plaintiff duly excepted. In obedience to the instruction there was a verdict for the defendant, on which the judgment was rendered.

J. J. Lynch, John H. Kimmons, and R. F. Kimmons, for plaintiff in error.

Edw. Mayes and J. B. Harris, for defendant in error.

Before PARDEE, McCORMICK, and SHELBY, Circuit Judges.

McCORMICK, Circuit Judge, after stating the case as above, delivered the opinion of the court.

Four errors are assigned. We will consider only the second, the substance of which is: The court erred in giving the instruction to the jury to find for the defendant, for the reason that there was a conflict in the testimony in regard to the sanity of Shook when he is said to have executed the release pleaded in bar; and, further, even though the testimony might be convincing that Shook, the plaintiff, was of sound mind at the time of the execution of the release pleaded by the defendant, yet there can be no doubt from all the testimony in the case that the fact that plaintiff's brain was injured was wholly unknown to him at the time he signed the release, and was not contemplated by him or by the defendant in the making of any settlement that may have been entered into by him at that time.

Counsel for the defendant in error submits that the only questions raised by the pleadings in this case were two: (1) The bare fact of the execution of the release; and (2) the sanity of the plaintiff at the time of such execution. Both his oral argument before this court and the printed brief which he filed proceed on that view of the pleadings.

It is to be observed that the language of the original replication

joining issue on the plea is that "it is not true that he (the plaintiff) executed a release from all damages for the injuries sustained by him mentioned in his declaration filed in this cause." And the amended replication, in addition to the charge of fraud, expressly avers that "in truth and in fact the damages to his head and brain were unknown to him, * * * and were not contemplated by him at the time of said alleged release, and were not intended to be and were not included in the settlement then and there made with the said defendant evidenced by the r lease pleaded by it in its second plea." Counsel for the defendant suggests that we may eliminate all questions of the original liability of the defendant, for that, so far as the issue of negligence is concerned, the case went off without reference to that point, and on the trial the defense relied on was the release executed by Shook in March, 1897. The trial court having given the peremptory instruction, the transcript before us contains all the testimony given in the case.

The counsel for the defendant states the evidence of Mrs. Shook substantially as follows:

"The accident occurred on November 22, 1896. Plaintiff was unconscious about thirty-six hours, then recognized witness. There were two wounds on the top and back of his head,—one a scalp wound, and the other tolerably deep and about two inches long. Shook was then thirty-nine years old. 'Never thought he was right mentally after the accident. First noticed symptoms of insanity in February or March, 1900.' He suffered with his head, and from time to time complained of it, until he lost his mind entirely. He was a religious man, but lost his interest in religious matters after the accident. He was an indulgent husband and father before the accident, but after that got irritable toward his family, and little things seemed great to him, and he got worse, and 'it gradually grew worse,'—'got worse toward the last.' His irritability was by spells. Cannot say when it began,—so far back,—but it was some time after the accident. He threatened the life of his oldest boy, who was about seventeen years of age. He was first able to go down town three or four weeks after the accident on crutches, and was then very weak. He did not rest well at night; sometimes would groan, etc.; and when she would wake him up he would seem like somebody crazy, and maybe it would be several minutes before witness could get him to recognize her. He went back to work in the latter part of December, 1896, or 1st of January, 1897. He remained in the railroad's employment until October 18, 1899, running when called on, and drew his salary regularly. After he was discharged he took a trip to Louisiana, where he stayed 'hardly a month.' Then went to Texas, where he stayed a month or six weeks. He was taken to Dr. Briggs, at Nashville, in May, 1900, and was then insane. Cannot say she knows his physical and mental condition on the 4th of March, 1897."

The Dr. Briggs just referred to was Charles S. Briggs, of Nashville, Tenn., a surgeon. Counsel for the defendant gives the evidence of this witness substantially as follows:

"He only knew Shook about three weeks, from June 2 to June 22, 1900. He was then insane from a chronic irritation of the brain caused by a depression of the skull. Trephined it to remove the depressed bone. His brain was diseased. The operation was not successful, because of the long time which had elapsed since the injury. From the nature of the accident described by counsel's questioning and from the injury to the skull, Shook 'would gradually become crazy, and his mind from the time of the accident would not enable him to appreciate the scope and meaning of his action in making a contract. He could not attend to his duties with any degree of intelligence.'"

On cross-examination Dr. Briggs said he only knew the cause of Shook's insanity by inference. He had never treated any other case of insanity caused by injury. He was asked the following questions, and answered them thus:

"X-Int. 33. Assuming that it is proven in this case that George A. Shook prior to the 22d day of November, 1896, was a competent and trusted engineer of the defendant railroad company, then engaged in operating a locomotive engine and a train of cars, and that on that day he received the injury to his head which you have described; assuming, further, that it is proven that after about one month from the 22d of November he (Shook) again entered the employment of the company, and was placed in charge of an engine and train of cars, and operated it successfully and to the entire satisfaction of his superior officers of the road for the space of two or three years after the injury and before you treated him,—that is, running over the main line of the road on schedule or on telegraphic orders, receiving and receipting for his wages, acting as a committeeman for a secret order to which he belonged, and transacting his business affairs generally in a satisfactory manner,— wouldn't the mind of a man capable of doing successfully and to the satisfaction of his superiors the acts mentioned and assumed in the foregoing enable him to appreciate as well as he ever could the scope and meaning of his action in signing a paper or in making a contract? Ans. I don't think that his mental capacity was ever as good after the injury as before, and I think that he was in no mental condition after the accident to appreciate the value of any document involving his personal interests. X-Int. 34. Would you say that an insane man could run a locomotive as they were operated on the I. C. R. R. for a space of two or three years,—I mean so successfully as to escape the notice of his co-employés and superior officers in daily contact with him? Ans. It depends on how insane he is. X-Int. 35. How often did you see him after he received the injury and before you treated him last? Ans. Not at all."

The record of the adjudication of insanity bears date May 4, 1900.

Emma Massey, a servant in the plaintiff's family at the time of the accident, testified that from that time she noticed a change in Shook's manner of treating his family and in his religious life.

Mr. Hogan, a minister of the gospel, and who was pastor of the church of which Shook was a member, testified that after the accident Shook became negligent for a time in his attendance at church, and became remarkably impatient and harsh in his family. He was allowed to testify, without objection, that Shook had remarked to him that the railroad had proposed to allow him to go back to work on condition that he sign the release. That his condition got worse gradually,—so gradually that the stages were hardly perceptible.

G. D. Able, a banker with whom the plaintiff did business, testified that after the accident his manner changed entirely. He grew to be excitable and disconnected in conversation. Could not with any degree of certainty state from what time these little peculiarities dated. Considered him just unbalanced,—not an insane man, but just in that state you might feel uneasy about him.

G. W. Price, a merchant with whom the plaintiff dealt, testified that he never considered Shook the same man after the accident, and it seemed like he gradually got worse. Children, from having been very fond of him, did not seem to want to be around him; that was the marked change; that he was an insane man after that, and had gradually grown worse. Cannot give the date when he first noticed anything wrong. Could not say it was within six months after the accident.

Tom Shipman, a merchant, testified: Did not regard Shook as a sane man. Bored witness, repeating things over and over, and swore a good deal, after his injury. Did not consider Shook capable of attending to business. Cannot say what his condition was in March, 1897. Shook bought goods from witness. Witness regarded him as having sense enough to trade with.

R. H. Ramsey, a machinist, testified: Right after the accident noticed something wrong with Shook, but did not think he was insane. He now considers that he was mentally unbalanced. Noticed a change in his mentality. He became very nervous and excitable. Did not consider that he was capable of conducting his business with the same good judgment and in the same manner as he did before.

T. P. Coleman, a physician (the wound being described by counsel), testified that he thought it would cause some mental derangement. Could not say what would be the effect on his mental capacity when it comes to reasoning and the making of contracts. If, as a fact, he was capable of running his train satisfactorily for three years after, it looks as if he was capable of understanding a contract like the release. Thinks it would require a sane man to do such work.

P. W. Rowland, a physician, testified: An injury to the skull producing pressure on the brain will cause mental disease, etc. Several questions were asked of this witness by counsel and answered, and then his honor, the judge, interposed and asked a couple of questions, as follows:

"By Court: Let me put a question. Suppose the proof to show that George A. Shook received an injury in a railroad accident in the fall of 1896, which caused a depression in his skull, and was insane when carried off after the accident, and so continued for a time, and was troubled continuously at frequent intervals with a pain in his head up to the time when he was pronounced a lunatic by the court; and suppose, further, that his whole mental temperaments after the accident were changed, as manifested in his treatment of his family and in his intercourse with his friends and acquaintances, from that of a man once clear-headed, cool, just, firm, kind, and considerate to that of a man of seemingly clouded intellect, changeable, and irritable to such an extent that he himself called the attention of his friends to the fact, and was conscious of it, but was unable to alter or control it. Now looking at all of these supposed proven facts, would you say that George A. Shook was a sane or insane man, and that he could successfully operate a train and engine on his road on schedule time, for a period of two years and ten months? A. In answer to that question, I will have to give you my knowledge gained from several accounts of injuries of that character,—the course they usually take. I can do that in a very few words. The cases are on record, and a great many of them, where an injury has been done to the brain, and where the skull presses on the brain under similar circumstances, a man who has been cheerful and gentle in disposition becomes, in the main, nervous and irritable and cross, and still carries on his business, but in a manner unsatisfactory to himself and to his friends. It frequently happens that a man goes on for some time, and there are even instances where they have gone on for years, but finally the result was insanity and death. Q. Do you think it reasonable and probable that he could operate a railroad locomotive for two years and ten months under those circumstances? A. I do not think he would be apt to do it."

Earl Brewer, an attorney at law, testified: Saw Shook once a week or once a month after he got out from his accident until he went to the asylum, and from his appearance witness never thought Shook was sane. Shook talked the accident over and over, and would curse

and swear and talk about the master mechanic. He consulted witness about suing the company, and discussed with him about making the settlement, and then told him he had settled. He would say he did not know he was hurt badly when he signed the release, and that he thought he could get around it. In the conversation witness had with Shook, when witness would first commence talking with him he would seem to be perfectly sane, and he would talk with you for some time that way until he would become irritated, and would begin cursing, and then you could notice that he was not exactly right.

Joe Baker, a conductor, one of the defendant's witnesses, testified: Shook was one of his regular engineers for three or four years after the injury. Witness saw no difference in his manner of conversation and conduct before and after the accident. Shook was finally discharged for violating a rule of the company up in Tennessee.

The defendant's counsel asks the court to note that the company not only took Shook back to work, but that he remained at work from the time of the signature of the release, March 4, 1897, until he was discharged for breach of rules, on the 18th of October, 1899, drawing large compensation all of the time.

In the foregoing recital we have adopted substantially, as far as we have quoted the evidence, the statement of it which we find in the brief of counsel for the defendant. The witnesses named went much more largely into detail, and both they, and other witnesses not named, on direct and cross-examination (with the usual difference in answers so drawn out, respectively), gave testimony tending to support the contention of the plaintiff on the issue of sanity, and made admissions or gave answers to cross interrogatories tending to qualify their direct testimony, and to an extent to support the defendant's contention on the issue of sanity.

There was evidence that Dr. Shoffner, the railroad surgeon at Water Valley, was called in to see the plaintiff immediately after he was injured, and had charge of his case during his confinement, and that when the plaintiff's wife called this physician's attention to the wounds on Shook's head the doctor said they did not amount to anything; that they were just scalp wounds. He never examined his head at all. He told Mrs. Shook that Mr. Shook was not hurt very seriously; that he would soon be all right. This he said after she had called his attention to the scalp wounds.

Mrs. Mary Howard, an employed nurse, testified that she was present in the family at the time the plaintiff was brought home injured, and helped to nurse him, and that the doctor gave him calomel and fever powder.

We conclude, therefore, that there was no evidence offered to support the plaintiff's charge in his second replication, that by the false and misleading statements of the defendant's agent and surgeon the plaintiff, in his mentally weak condition, was kept in ignorance of his rights in the premises and of his true condition, and was, by means of false and feigned promises of employment made to him by the said defendant, induced to sign the alleged release for a grossly inadequate consideration. Nearly the whole of the proof

drawn out by the defendant's cross interrogatories, or embraced in the testimony of the witnesses whom the defendant called to meet the issue of insanity submitted by the plaintiff, tends to show that at the date of the signing of the release it was not in the contemplation of the plaintiff nor of the defendant that the plaintiff had received any injury to his brain by reason of the wounds appearing on his head, and that it could not have been intended by either of the parties that any injury to the brain of the plaintiff was to be included, or was included, in the settlement made on March 4, 1897, referred to in the defendant's second plea as a release, which it sets up in bar.

It appears to have seemed incredible to the trial judge that the plaintiff should have been on March 4, 1897, mentally disordered to such an extent that he could not bind himself by a written release, when in fact at that time, and for 2 years and 10 months thereafter, he was engaged in the service of the defendant as a locomotive engineer in pulling its freight trains on schedule and telegraphic orders, without showing any incapacity for that service. Assuming that the view of the trial judge on this subject is correct, it seems equally incredible that the defendant should have employed the plaintiff for that service if its representative agents knew or believed or suspected that his brain had been materially injured by the wounds appearing on his head. The amount received in the settlement was substantially equal to the wages of the plaintiff for one month's service, which was approximately the time he was out of employment,—from the 22d of November, 1896, the day on which the accident occurred, until his return to service, the latter part of the following December. It is hardly credible that if the plaintiff knew or believed, or had adequate reason to suspect, that his skull was fractured, and resting on his brain, and causing him to experience the pain in his head of which he at times complained, he would have consented, for so inconsiderable a sum, to release the defendant from all claims for damage on that account. There is, moreover, proof that when, some time after the settlement with the defendant, it was suggested to him that his mind was affected, he scouted the suggestion as preposterous, and resented it as offensive.

There having been offered on the trial material evidence, pro and con, on the issue of the plaintiff's sanity on the 4th of March, 1897, and bearing also on the issue of whether the injury to the plaintiff's brain was in fact in the contemplation of the parties and included in the settlement, the case was one for the jury. Railroad Co. v. Harris, 158 U. S. 326, 15 Sup. Ct. 843, 39 L. Ed. 1003.

For the error of the court in withdrawing the case from the consideration of the jury, the judgment of the circuit court is reversed, and the cause is remanded, with direction to award the plaintiff a new trial.