# EDNA J. SERR v. BIWABIK CONCRETE AGGREGATE COMPANY.[1]

No. 31,285.

February 11, 1938.

[1]Reported in 278 N. W. 355.

166

*Hunt & Palmer,* for appellant.
*Sidney E. Kaner* and *Lewis, Grannis & Underhill,* for respondent.

JULIUS J. OLSON, JUSTICE.

Defendant appeals from an order denying its blended motion for judgment notwithstanding or new trial.

The facts viewed in the light most favorable to plaintiff may be summarized in this fashion: Defendant over a period of years had

been engaged in operating a gravel plant near highway No. 35 between Aurora and Biwabik. In carrying on its work it had occasion to use horses. A few days prior to July 30, 1930, it had borrowed a horse from a near-by farmer and was using it with one of its own. Both animals were in its exclusive care and possession, the man in charge being one Korenich. On the day mentioned the borrowed horse had been used with one of defendant's own horses at the plant. At quitting time, about five o'clock that afternoon, Korenich took the horses to the company's barn for the purpose of unharnessing them. He tied and unharnessed the company's horse first. Without tying the horse here involved, although there was a halter rope attached to it, he proceeded to take off its harness. As the harness was removed the horse turned around and calmly took a walk out of the barn. Korenich made some futile efforts to catch it, but the horse kept "turning around and wouldn't let me catch him. I tried to catch him a couple of minutes, or a minute or so, I tried to catch him so as to put him back in the barn." Having failed to accomplish his purpose, he concluded to also let loose the other horse, it being his idea that if the horses were together they probably would not stray far. Another horse owned by defendant but not in use that day had been permitted to roam outside all day. As quitting time had arrived Korenich made no further effort to secure any of the horses but left for his home some distance away.

Mr. Taylor, president and active manager of defendant company, was at the office near which the barn was located. He stayed until about six o'clock but claims he did not see the horses. There was no fence between the company's property where the horses were grazing and the highway, so the horses could "go anywhere they wanted to."

Shortly after nine o'clock that evening, the night being "pretty dark," the accident happened. Plaintiff, as a guest passenger, was riding in a car driven by one Strutzel, she and two other girls occupying the rear seat, one Zimmerman occupying the front seat with and to the right of the driver. Strutzel testified that he was driving upon this highway, which is a paved and much used one, at

a rate of about 35 to 40 miles an hour. He describes the road as wide, the country as hilly. He noticed a car coming from the opposite direction. Both cars were lighted. As the two cars were approaching each other Strutzel was "blinded by the other driver's lights to a certain extent." As the approaching car "was just about passing me, it had just probably got alongside of me and passed me, I noticed this object that loomed up in front of me; it probably had come from behind the other car. I was momentarily blinded as you are when a car passes you. * * * Well, as soon as I saw this object loom up in front of me, probably not over 10 or 12 feet away, I sharply, quickly, turned to the right over on the shoulder to avoid the accident, but the horse hit the left side of the car." The object to which the witness referred was the borrowed horse. As a result both windows on the left side of the car were smashed and the horse instantly killed. The witness noticed that plaintiff "was quite badly cut up" from the shattered glass. She was taken immediately to a doctor for treatment and thereafter taken to her father's home not far distant from the place of accident.

Plaintiff's father was an employe of defendant. He testified that the day after the accident Mr. Taylor, acting for defendant, talked to him about the accident. He told Taylor that his daughter "was hurt pretty bad." A few days later Taylor and one Campbell, also an officer of defendant, again talked to plaintiff's father, the former suggesting "if your daughter would like to do any settlement about that accident case" to come around to the office. Accordingly, plaintiff and her father called there a few days later. The father told Taylor: "Mr. Taylor, I bring her over now. If you got anything to do with it." Replying, Taylor is quoted as saying: "She looks pretty terrible, but I don't know if I got anything to do with it." Apparently nothing was done that day. The visit was short. Plaintiff testified that Taylor "looked very angry" and said, "I haven't anything to do with that. I didn't have anything to do with that accident." Something like a week or more thereafter Taylor drove up to her father's house bringing with him a young lady, a notary, and asked plaintiff to get into the car with them so that they might go to the bank. This was Saturday afternoon,

August 18. The only persons at the bank were Taylor, the young lady notary, and plaintiff. Plaintiff testified: "Mr. Taylor told me that he had talked to the doctor and asked him about my injuries, and the doctor told him that I would be all right pretty soon and my scars would disappear in time, and he was offering me $100, which he thought was enough to cover my doctor bills and pay my expenses, pay for my clothes that were ruined." She also testified that she had been seeing the doctor every day since the accident and that she had inquired of him, "if I would be all right or not, or the way I should be, and if my scars would disappear, and he said, 'Yes, they will take a little time, but they will gradually disappear.'" A $100 check had been prepared before this date by Mr. Taylor, also a contract of release and indemnity. Plaintiff testified as follows: "He had a check already prepared, all written out; he said he was offering me that check for $100, and he thought that was enough to cover my expenses." Plaintiff thought this settlement was fair, as she "never dreamed I had anything like that in my head," referring to the piece of glass in her head to which reference will be made later. The release, a typewritten instrument of two pages, was handed to her folded in such fashion as to disclose only a few lines above the places for the signature of all the occupants of the Strutzel car. Plaintiff signed the release without reading it, nor was it read or explained to her. She was still suffering from the shock caused by the accident. She accepted the check the same day, August 18, 1930, and indorsed and cashed it some eight or nine days later. The check bears date August 16, the release August 11, 1930. The release appears to have been acknowledged August 18, and all occupants of the car apparently have signed it.

She remained at home with her parents until sometime in September, receiving treatment from time to time. But she experienced great pain, became nervous and fidgety. Nevertheless she took on the job of teaching school in South Dakota and remained there, and later was married. A child was born to her about a year and a half after the marriage. She continued to suffer pain in the region of that side of her head where she was most badly cut

by the flying glass at the time of accident, and sought treatment from various medical men in the hope of getting relief. She was advised to use glasses. But this did not improve her condition. Finally her condition became so bad that she concluded to go to Rochester. On her way there she stopped at Minneapolis. While there she was informed about the Nicollet Clinic, and she went to it. She was X-rayed there, and then for the first time (October, 1935) it was discovered that a large piece of glass was deeply imbedded in her left temple near the hairline. A few days later an operation was performed and the glass removed.

The testimony indicates that this piece of glass had become imbedded under plaintiff's cheekbone, between the cheekbone and the underlying skull, later having penetrated through the temporal muscle and traveled upward some three and one-half inches from the port of entry. Plaintiff had continued to bear this suffering more than five years before the real difficulty was discovered. During all of that time she suffered intense pain and much discomfort. The piece of glass so entering into her head was introduced at the trial, as were also the X-ray photographs. The piece of glass may be described as a rectangular triangle, one and three-eighths inches from base to apex, base one-half inch, thickness one-quarter inch. The hypotenuse and apex are jagged. As this piece of glass traveled some three and one-half inches from point of entry to where it was when removed, it is obvious that plaintiff must have gone through real agony during the more than five years of time elapsing between the date of accident and date of its removal. That was the view of her medical expert, who testified that his examination "revealed scars, several small, almost imperceptible scars on the right lower face, a linear surgical scar within the hairline in the left temple region, a somewhat raised, whitened, irregular scar over the left cheekbone running downwards toward the corner of the nose and the left upper lip, a smaller scar on the left lower cheek. The left cheek is somewhat thicker and gives the impression that the tissues are thickened or swollen." He found evidence of considerable nervousness, a tendency to tremble. On the left side of her face there is more or less of muscular twitching starting at

the scar over the cheek and thence running down to the upper lip and the corner of her nose. This in turn draws the corner of the nose and upper lip toward the scar on her cheekbone. The twitching is permanent and will be likely to cause nervous irritation. The thickened condition of the left cheek is also likely to be permanent. The pronounced scar on plaintiff's cheek is permanent. The reason for the piece of glass having moved a distance of about three and one-half inches from the point of entry is explained by the doctor as due to the fact that the muscles in that region have a tendency to cause such movement. The muscles in that region because of their frequent use necessarily caused this movement of the imbedded piece of glass, which in turn brought about the pain and suffering concerning which plaintiff had testified. It is likely to cause future headaches, fatigue, irritation, and lack of vigor. He ascribed plaintiff's depressed and irritable condition as traceable to the presence of this foreign object. Upon examining the X-ray photographs of plaintiff's head and comparing these with the glass removed from her head, the doctor was of opinion that the two fit together in such fashion as to convince him that the photographs taken represented this particular piece of glass as it appeared in plaintiff's head before it was removed. We have had occasion to examine the exhibits in this regard and are satisfied that the doctor's conclusions in this respect are well founded.

Defendant's principal defense and upon which it places most reliance has to do with the release which plaintiff and the other occupants of the car signed. The record does not show when the other occupants signed this release nor the circumstances connected therewith. But we are not concerned with that feature, our only concern relating to what was done at the time plaintiff signed it.

The instrument is carefully worded; one that bears unmistakable earmarks of having been prepared by one trained in the art of drafting such instruments. It is rather lengthy, including as it does two typewritten sheets, 8½ by 13 inches in size. Summarization of it is deemed desirable. To begin with, there is recited the occurrence of the accident in which there was "injury to an automobile," also resulting "in bodily injuries to the occupants of said

automobile" (naming them, including plaintiff); that these persons (*i. e.,* the owner of the vehicle and the passengers in the car) "have made a claim upon C. H. Taylor and Biwabik Concrete Aggregate Company, parties of the second part, *for money compensation for injury to the automobile and for personal injuries to themselves,* asserting that the said parties of the second part are legally liable for said accident and injuries, which said legal liability the said parties of the second part expressly deny."

In consideration "of $1.00 and other valuable consideration to each and the receipt of the sum of *$125.00* is hereby acknowledged by the owner or owners of said automobile, in hand paid by" Taylor and defendant, claimants (including plaintiff) "do hereby remise, release and forever discharge the said parties of the second part, their heirs, successors, administrators, and assigns and all other persons, firms, or corporations who are or might be liable, from any and all actions, causes of actions, claims and demands for, upon or by reason of any damage, loss, suffering, or injury to person and/or property, whether *developed or undeveloped,* which heretofore has been or which hereafter may be sustained by the said parties of the first part including all claims for loss of services, doctor bills and expenses in consequence of such accident and injury."

And claimants "do hereby expressly stipulate and agree, in consideration of the aforesaid payment, to indemnify and hold forever harmless" Taylor and defendant "against loss from any further claims, demands or actions that may hereafter or any time, be made or brought against the said parties of the second part or by anyone for the purpose of influencing a further claim for damages on account of the damages or injuries sustained in consideration of the aforesaid accident.

"It is understood and agreed that the parties of the first part rely wholly upon their own judgment, belief and knowledge of the nature, extent and duration of said damages and of said injuries and that no representations or statements regarding said injuries or regarding any other matters made by the parties of the second part or by any person or persons representing them or by any physician

174

or surgeon by them employed has influenced the first parties to any extent whatever in making this release.

"All agreements and understandings between the parties hereto are embodied and expressed herein and the *terms of this release are contractual and not a mere recital."* (Italics supplied.)

The instrument bears the signatures of all claimants but not of Taylor or defendant.

Defendant asserts: (1) That the release executed by plaintiff and the other claimants to defendant and Taylor, by its language, took into consideration both known and unknown injuries, thus taking the case out of the operation of the rule governing mutual mistake; (2) that the release was not intended to compensate for injuries, but rather and only was the result of defendant's desire to avoid litigation by purchasing peace; (3) that the release contains an unassailable contract of indemnity which must stand in any event; (4) that the release as against Taylor, he not being a party to this cause, stands as an effective barrier to plaintiff's claim against defendant.

■ It is settled law in this state and elsewhere that, at least in the absence of express provisions to the contrary, a settlement for known injuries does not bar a later action for existing but unknown ones, there being mutual mistake as to the latter. Nygard v. Minneapolis St. Ry. Co. 147 Minn. 109, 179 N. W. 642; Mix v. Downing, 176 Minn. 156, 222 N. W. 913; 48 A. L. R. 1462; 15 Minn. L. Rev. 805. Also, that where the release expressly so provides, subsequently discovered unknown injuries will not support an action for its avoidance. Hanson v. Northern States Power Co. 198 Minn. 24, 268 N. W. 642. Further, that unknown and unexpected consequences of a known injury will not bring a case within the rule permitting avoidance of a release on the ground of mutual mistake. Richardson v. C. M. & St. P. Ry. Co. 157 Minn. 474, 196 N. W. 643. The involved release by its terms discharged defendant and Taylor from liability for injuries "whether developed or undeveloped." We think that language can cover only the *unknown consequences* of *known* injuries. Unlike the release in Hanson v. Northern States Power Co. *supra,* the present release does not specifically cover

"known or unknown" *injuries*. A "developed" *injury* can mean only one, the existence of which is known. An "undeveloped" *injury* as clearly connotes one the *existence* of which is known, but the *extent* whereof is not. Here the *known injuries* were limited to the cuts and bruises then clearly apparent. There was nothing "developed or undeveloped" about them. The contract had for its basis "money compensation * * * for personal injuries" to the individuals suffering therefrom, as much as "for injury to the automobile." We think the language so carefully chosen by defendant and its chief officer, Mr. Taylor, takes this case out of the operation of the rule of the Hanson case and places it under that of the Nygard and Mix cases.

█ Defendant's next ground is that the subject matter of the release was to "buy peace" and not to compensate for injuries. The effect of that argument is that the injuries, not being part of the consideration, their nature and extent is immaterial. The argument is ingenious but not convincing. The case of Cogswell v. Boston & Maine Railroad, 78 N. H. 379, 101 A. 145, is said to be determinative. We do not think so. That was a suit in equity to set aside a release in aid of an action at law to recover damages. The trial court had found the contract of release to have been entered into for the purpose and with the intention of avoiding future litigation. For this reason, the appellate court was of the view that the further finding of mutual mistake was immaterial. Here the triers of fact have determined the first question otherwise. The court did not overrule the prior case of McIsaac v. McMurray, 77 N. H. 466, 93 A. 115, L. R. A. 1916B, 769, where the injured party was granted relief because the settlement was for *known* as distinguished from *unknown* injuries.

But however that may be, we conceive that courts in the furtherance of justice should ignore mere form in their search for substance. The fact that the amount paid was determined by reference to the injuries understood and recognized to have been suffered is the controlling feature, despite defendant's attempt to pass it off as incidental.

"Equity aims to afford relief to parties who have bound themselves by a written contract executed in justifiable ignorance of a past or existing fact which is so material to the subject matter that if it had been known the contract would not have been made." Mix v. Downing, 176 Minn. 156, 161, 222 N. W. 913, 915.

"The release does not expressly include unknown injuries. But we are not prepared to say that even if it had, it would have availed against the evidence here which clearly proved no such injuries to have been within the knowledge or contemplation of the parties. * * * If fraud or mutual mistake has induced the making of an unconscionable contract, courts ought to be more concerned about granting relief, than desirous of clinching future wrongs by making such contracts incontestable. * * * The doctrine that a contract or release may be avoided for fraud is no better established than the one that such an instrument may be set aside on the ground of mutual mistake as to an existing fact material to the agreement." Nygard v. Minneapolis St. Ry. Co. 147 Minn. 109, 112, 179 N. W. 642, 643.

Plaintiff did not have the advice or assistance of counsel when the settlement was made. She had been treated by her physician, who believed that she had sustained only superficial cuts and would soon recover. Taylor was of the same view. No X-rays had been taken. Plainly the parties had in mind only *superficial* injuries.

Where, as here, one pays another for the purpose of avoiding litigation, the basis of settlement, the real subject matter of the contract, is *compensation for known injuries*. That is what the parties sought to do. That was the essence of their agreement. To the extent then known it was the primary, if not sole, measure of the amount accepted by the injured party. We agree with the lower court's apt observation that every such case of settlement can be properly termed an attempt to avoid litigation. That, however, is but a necessary and the desired result of the settlement which follows agreement upon the inducing cause of avoidance, *i. e.,* the nature and extent of the injuries and compensation therefor. To hold otherwise would leave the door wide open where, by mere form

of words, alone, the actual liability is avoided. That is not what any of the parties intended or sought to accomplish.

We are strengthened in this view by the written contract itself. We note that as originally worded the consideration going to each of the individuals was $1.00. The clause "and other valuable consideration" was inserted in pen and ink and apparently in Mr. Taylor's handwriting. The instrument then proceeds with a recital of payment "of $125.00" to the "owner or owners of said automobile." Is it possible that Taylor was "buying peace" in making such adjustment? Is it not obvious that he was in fact paying the "money compensation for injury to the automobile?" The situation is such that, viewed from all angles, including the contract itself, the parties intended also to settle "for personal injuries" upon the common sense basis of "compensation" for all harm then known to exist.

Also of some importance is the further fact that Taylor deducted "somewhere around a hundred dollars" out of Korenich's pay check, apparently because he was "partly to blame" for the accident. That does not seem like "buying peace." Rather it seems much like an enforced contribution to help pay for the harm done.

The contract insofar as it relates to indemnity, being a part and portion of the release itself, adds nothing. It is supported by no other or greater consideration than the release, of which it is an integral part; hence, if one falls so must the other.

Defendant's fourth ground of attack is likewise interesting but ineffective. It is well established, of course, that a valid release of one joint tortfeasor is a release of all others jointly liable. 5 Dunnell, Minn. Dig. (2 ed. & Supps. 1932, 1934, 1937) § 8373; 53 C. J. p. 1254 [§ 77]. Equally well settled is the rule that a valid release or exoneration of the servant releases the master, the latter's liability for a tort committed in the scope of employment being derivative only. 18 R. C. L. p. 776, § 236; 54 L. R. A. 649. The escape of one, however, is predicated upon the existence of a valid and subsisting release of the other. But where, as here, the release itself is attacked, the reason for the rule collapses and takes the rule with it. Where defendant sets up in bar a release to another

claimed joint tortfeasor, the test is what would happen if the other were sued. Chicago & Alton R. Co. v. Wagner, 239 U. S. 452, 36 S. Ct. 135, 60 L. ed. 379. And it makes no difference that the one already released is not a party to the action. Since one tortfeasor can assert in bar a release to a fellow tortfeasor without joining the latter, it is not only just but logical to allow plaintiff to set up its invalidity without being required to make the other a party. The real and only inquiry in such case is the existence or non-existence, validity or invalidity, of a claimed release, not the presence or absence as a party of the one purportedly released. Hence the involved release itself being the only issue, the attack need be directed only as against it, and not as against the one in whose favor it was executed. The presence of the latter becomes unimportant. Holding the release ineffective, as we do, places the parties in the same position as if there had been no release at all. Absent a release, no one can deny that the injured party can sue either the master or servant or both. By refusing to attack the release as against Taylor, plaintiff simply chose to assert her right against his corporation alone, as she could have done had there been no release in the first instance. Her cause did not depend upon this instrument, but defendant's defense did. It was up to it to establish its position so as to withstand plaintiff's counter attack. This it failed to do.

■ Considerable argument has been made respecting proximate and intervening cause. The court's instruction in that regard was as follows:

"The proximate cause of an injury is that which causes it directly and immediately, or through a natural sequence of events without the intervention of another independent and efficient cause."

That instruction had been requested by defendant and was given. We can find no fault with it, and certainly defendant is in no position to complain.

Defendant's claim that the drivers of the two approaching cars were negligent and that their conduct was what brought about plaintiff's hurt was clearly for the jury. In point of fact this case

is much stronger for this plaintiff than was it for plaintiff in Wedel v. Johnson, 196 Minn. 170, 264 N. W. 689. A reading of that case will readily demonstrate that the chain of causation there was less persuasive for Wedel than that here relied upon by this plaintiff. An interesting and instructive review by Professor William L. Prosser, dealing with proximate cause, wherein the cases of this court are thoroughly considered, is found in 21 Minn. L. Rev. 19.

■ During the course of the trial plaintiff testified that she had been in possession of the involved piece of glass ever since it was removed from her head until the time of trial. On cross-examination it developed that she was mistaken about this in that she had delivered it to her counsel at the time or immediately prior to the commencement of her action. Evidently she was much disturbed over it. A short recess was taken. She went into the ladies' washroom and there became hysterical. The court carefully investigated the situation and determined in a practical way, as we see it, and as the record abundantly demonstrates, that no harm had resulted to either party. Her medical expert went into the room where she was at the time and managed to quiet her. The court was present standing in the corridor at the time the incident occurred. When court reconvened shortly thereafter it was suggested by counsel for plaintiff that the jury be instructed with reference to the matter in order that any possible prejudice might be cured. Request also was made that defendant indicate to the court what instructions, if any, were desired, or to indicate whether it preferred that the incident be allowed to pass without any instructions from the court with reference thereto. At the close of the trial the court instructed the jury, in accordance with defendant's request, as follows:

"I have already stated to you that you are to decide this case and the questions I have been talking about from the evidence that has been given here in court, and in your deliberations you are not to be influenced by motives of bias or sympathy, *nor are you to allow your minds to be swayed by any event that may have occurred out-*

*side the courtroom and during the progress of the trial."* (Italics supplied.)

On the motion for new trial the court carefully reconsidered this phase and came to the conclusion that the incident referred to was insufficient to justify the court in ordering a mistrial at the time it occurred or in granting a new trial. We concur in that view. Such matters as these are peculiarly for the court having the thing in hand when the occasion arises. We think the incident was handled in a most satisfactory manner.

■ The court instructed the jury in respect of defendant's duties as follows:

"Now, then, in reference to the duties of the defendant which it is claimed he violated, we have in this state a law passed by the legislature which provides as follows:

" 'It shall be unlawful for any owner or any person having the control of any animal of the species of cattle, horse,' and so forth, 'to permit the same to run at large in the state of Minnesota.' [2 Mason Minn. St. 1927, § 7295.]

"You are instructed that the phrase, 'running at large,' as used in the statute, means the permitting of any animal mentioned in the statute to stroll, wander, rove or ramble at will without restraint or confinement.   *   *   *

"If a person violates that statute and such violation is the cause, as we say, the proximate cause of injury to another, then the person who so violates that statute is liable for the resulting damage."

The instruction is criticized upon the theory that the fact situation presented nothing justifying the application of the statute. We think Wedel v. Johnson, 196 Minn. 170, 264 N. W. 689, effectively disposes of this objection. By referring to p. 295 of the record in that case we find that the court instructed the jury in substance the same as here. Defendant cites Lackey v. Peterson, 161 Minn. 315, 201 N. W. 428, as authority for its criticism of the charge. A reading of the record and briefs in that case establishes that the court applied the same statute and substantially the same language in its definition of what "running at large" meant. The facts there

were that defendant had opened a gate across the road from his farmyard, the purpose being to let the animals into the farmyard from the pasture. That obviously distinguishes it from the facts here appearing. There the jury found for defendant. Here the finding was for plaintiff. There is ample ground for the difference in result.

■ Complaint is made respecting the closing argument of plaintiff's counsel. The only matter concerning which we find any room for criticism relates to that part of the argument where reference was made to the financial inability of plaintiff to have doctors who had treated her in South Dakota and elsewhere present at the trial. But that argument was not used to create sympathy but rather as an excuse for not having them there. Another point, also claimed to be subject to criticism, is that counsel told the jury not to worry about the verdict because of the possibility of appeal; that in respect thereto the matter would be taken care of by counsel. Gegere v. C. & N. W. Ry. Co. 175 Minn. 96, 220 N. W. 429, is cited as supporting defendant's view. We have carefully read the entire argument of counsel for both parties and have come to the conclusion that, while there may be some room for criticism, we are by no means convinced that harm resulted to defendant. The trial court, much better equipped than we to pass upon this question, considered the objections inconsequential.

The size of the verdict indicates that the jury could not have been aroused to passion or prejudice. Only $4,300 was allowed plaintiff in addition to the $100 that had been paid at the time of the signing of the release. The size of the verdict bespeaks conservatism in estimating plaintiff's damages for the great pain and suffering she endured during all the time intervening between the date of accident and time of trial. Then, too, as we have already pointed out, she must bear hereafter the permanent scars upon her face and the other handicaps mentioned. While the size of the verdict is attacked in the assignments of error, no other mention is made of it in the brief; and we think properly. In our view, the record abundantly sustains the amount allowed her.

Order affirmed.

182

On March 11, 1938, the following opinion was filed:

JULIUS J. OLSON, JUSTICE.

Defendant's petition for rehearing is largely devoted to an attack upon that part of our opinion having to do with the much discussed release. (Subd. 4.) Boiled down, defendant's claim is:

"There must be found to exist a mutual mistake, not a mutual mistake as between one of the parties to the instrument and a stranger to it not within the jurisdiction of the court, but a mutual mistake between the parties to that instrument, who are brought into court for the determination of that very issue."

The fact issue presented by the pleadings on this phase was raised by defendant in its answer, wherein, having "denied all liability," it as new matter alleged that "in compromise and settlement" of plaintiff's claim it had paid on a given date to "the plaintiff a sum of money, and the plaintiff in consideration thereof compromised and settled all claims against the defendant arising from said accident, both past and future, and released and discharged the defendant therefrom." In her reply plaintiff pleaded avoidance based on fraud and mutual mistake. No suggestion was made in the pleadings or otherwise that Taylor was a necessary party to the litigation. Defendant throughout relied upon the validity of the release. Mr. Taylor testified in support of it and fully covered everything that took place at the time of its signing and delivery and of the payment of the $100 check to plaintiff. Immediately before the case was submitted to the jury, on defendant's motion for direction of verdict and as one of the grounds for demanding such, its claim was that "it appears as a matter of law that on or about August 18, 1930, for valuable consideration, the plaintiff released and discharged the defendant from all liability and compromised and settled all claims arising from the accident." Not until it made its motion, here for review on the court's order denying it, was any suggestion made that because of Taylor's absence from the case as a party the involved instrument was invulnerable. In the mentioned motion defendant assigned as a reason for judgment not-

withstanding that it appeared "as a matter of law that plaintiff has released one C. H. Taylor as a joint tortfeasor from all liability for damages claimed or sustained in the premises."

■ Under our practice, if there be defect of parties, whether plaintiff or defendant, and if such defect appears on the face of the complaint, it is necessary that suitable objection be taken thereto by demurrer. On the other hand, if the defect does not appear on the face of the complaint, the objection may be taken by answer. If no such objection is taken advantage of either by demurrer or answer, defendant is deemed to have waived the same. He cannot later raise the objection by motion for dismissal, for judgment on the pleadings, for direction of verdict, or by objection to the evidence. This rule applies whether the cause be founded *ex contractu* or *ex delicto*. 5 Dunnell, Minn. Dig. (2 ed. & Supps. 1932, 1934, 1937) §§ 7323, 7508. Here no such preliminary steps were taken. The case was tried on its merits and disposed of upon the issues presented by the pleadings.

■ "Who shall be made parties in equity is a question of convenience and discretion, rather than of absolute right, to be determined according to the exigencies of the particular case. There is an important distinction as respects parties defendant between those who are necessary and those who are merely proper. Necessary parties are those without whom no decree at all can be effectively made determining the principal issues in the cause. Proper parties are those without whom a substantial decree may be made, but not a decree which shall completely settle all the questions which may be involved in the controversy and conclude the rights of all the persons who have any interest in the subject-matter of-the litigation." 5 Dunnell, Minn. Dig. (2 ed. & Supps. 1932, 1934, 1937) § 7316.

■ Defendant's theory apparently is that in any litigation involving rescission all parties to the agreement are necessary parties to the suit; hence when the release was received in evidence plaintiff's cause failed on account of Taylor's absence as a party to the cause;

that the release being voidable only and not void, rescission was the only means whereby plaintiff might avoid its consequences.

Decision must be governed by the rule of our own cases, which is to the effect that "if the rights of the parties can be easily and equitably adjusted in the action brought upon the original demand, a strict application of the rule requiring an offer to return the money received will not be enforced." Helvetia Copper Co. v. Hart-Parr Co. 142 Minn. 74, 78, 171 N. W. 272, 274, 767; Marple v. Minneapolis & St. L. R. Co. 115 Minn. 262, 132 N. W. 333, Ann. Cas. 1912D, 1082. The theory is that substantial justice in the final disposition of the case is the real criterion to apply. This is done "where the money received on the settlement is deducted from the amount of the recovery." (115 Minn. 266.) That is exactly what occurred here. The court in its charge to the jury instructed them that "if you find in favor of the plaintiff you must deduct from the amount of your verdict the $100 paid by defendant to plaintiff at the time of the execution of said release, together with interest at six per cent from that date." Plaintiff in her reply offered that deduction, so the court's charge was in harmony with the theory upon which issues were made and the case tried. The applicable rule is succinctly stated in 5 Dunnell, Minn. Dig. (2 ed. & Supps. 1932, 1934, 1937) § 8374:

"A release procured by fraud may be canceled in an equitable action brought for that purpose. The fraud may also be shown in a legal action to defeat the effect of the release when interposed as a defence. In either case the evidence of fraud must be clear. *A party is not bound to return or tender money received under a fraudulent release where the adverse party pleads the release as a defence."* (Italics supplied.) The cases are cited under note 39.

▉▉▉ Plaintiff could have proceeded against Taylor, Korenich, and defendant jointly. Mayberry v. N. P. Ry. Co. 100 Minn. 79, 110 N. W. 356, 12 L.R.A.(N.S.) 675, 10 Ann. Cas. 754. (There is an interesting and exhaustive annotation bearing on this phase under annotation 98 A. L. R. 1057, *et seq.*) She could, as she did, sue the master only. That is done in most cases where liability exists by

reason of relationship of master and servant so that the doctrine of *respondeat superior* applies. As we have seen, the procedural steps are not now subject to attack because defendant did not make timely issue of defect of parties defendant. Had it done so it would have been required to distinctly raise and specifically show wherein the defect consisted, naming the person or persons who should have been joined. 5 Dunnell, Minn. Dig. (2 ed.) § 7324. It might on its own motion under the statute have brought in Taylor as an additional party. 2 Mason Minn. St. 1927, § 9181; 5 Dunnell, Minn. Dig. (2 ed. & Supps. 1932, 1934, 1937) § 7328. If it deemed him a necessary party it was its duty to raise that question seasonably to the end that he be brought into the case and then have the trial proceed after all such parties were before the court. Thus it has been held that where a person is named as a party defendant in the title of the action but no service has been made upon him and it is found that he is a necessary party, the proper practice is to continue the action or delay the trial until he may be brought in. In an equity suit the court may on its own motion at the trial or otherwise continue or dismiss the suit for want of a necessary defendant. Or the court may continue the suit until such party is brought in. 5 Dunnell, Minn. Dig. (2 ed.) § 7325. Independent of the statute, the court has inherent power to bring before it persons who are not named parties "whenever, for the complete administration of justice," this is deemed necessary. 5 Dunnell, Minn. Dig. (2 ed. & Supps. 1932, 1934, 1937) § 7329, and cases cited under notes.

■ Defendant did none of these things. It risked its defense upon what turned out to be an infirm crutch. It is not in position to complain. This case is similar in principle to Lavelle v. Anderson, 197 Minn. 169, 171, 266 N. W. 445, 446. In that case the verdict established "that the driver of plaintiff's car [his son] was not a joint tortfeasor [with defendants] in the matter. So no release of defendants can be claimed on that ground." The son was not a party to the cause. There, as here, defendants sought to escape liability because of a claimed release of one joint tortfeasor. The defense failed for the reason quoted. Here it failed because the jury

found, upon adequate evidence, that the alleged release was not at all what it purported to be but on the contrary was a mere scrap of paper without binding force. The absence of Taylor as a party was wholly immaterial. The validity of the release itself was then the only issue, and not at all the presence or absence of one of the parties in whose favor it was purportedly executed. If the release had run to Taylor alone, defendant would have had the same right as it here sought, *i. e.*, to plead and prove its existence as a valid release. If such it had been found to be, clearly plaintiff's cause would have been lost. Because it failed to withstand the test of validity, defendant's proof, thought to be sufficient to support its defense, fell flat. Its infirmity was the cause of its fall, not the presence or absence of Mr. Taylor as a party. Here, as in Smith v. Mann, 184 Minn. 485, 488, 239 N. W. 223, 224, if plaintiff's general release had been found good it would have "operated not only *in personam* on the releasees and their liability, but also *in rem* on the releasor's cause of action. * * * The destruction of it [the cause] is the primary result from which follows necessarily the secondary one of releasing all the wrongdoers, whether their wrongs were concurrent or successive."

The petition for reargument is denied.

MR. JUSTICE STONE, because of illness, took no part in the consideration or decision of this case.