Thomas BOOTH and Angela Booth, Respondents,

v.

Ryan GADES, Defendant,

City of Cyrus Fire Department, Appellant.

No. A08–2054.

Supreme Court of Minnesota.

Aug. 19, 2010.

Rehearing Denied Sept. 17, 2010.

Amy J. Doll, Fluegel, Anderson, McLaughlin, & Brutlag, Chartered, Morris, MN, for respondents.

Timothy P. Tobin, Lynn Schmidt Walters, Brock P. Alton, Gislason & Hunter LLP, Minneapolis, MN, for appellant.

## OPINION

GILDEA, Chief Justice.

█ This case involves the question of whether, in the absence of excess insurance coverage, a settlement agreement based on the type of partial release approved in *Drake v. Ryan*, 514 N.W.2d 785 (Minn.1994),[1] completely discharges the settling tortfeasor from liability or whether it merely operates to limit the sources of recovery available to a claimant. The district court held that the agreement released all claims, but the court of appeals reversed. *Booth v. Gades*, 771 N.W.2d 69, 70 (Minn.App.2009). Because we hold that the agreement operated to release all claims against the settling tortfeasor, we reverse.

Ryan Gades was a volunteer firefighter for the City of Cyrus (the City). On January 25, 2006, Gades was responding to a fire call when he allegedly failed to stop for a stop sign and collided with a vehicle driven by Thomas Booth. Booth and his wife, Angela Booth, were both injured in the accident. At the time of the accident, Gades was driving his GMC pickup truck on which he had a personal automobile insurance policy with Progressive Preferred Insurance Company (Progressive). Gades' policy with Progressive provided $50,000 of insurance coverage.

The Booths submitted a claim to Gades, individually, and to Progressive for injuries they suffered in the accident. On May 1, 2007, the Booths, believing Gades to be covered by the City's liability policy with Auto–Owners Insurance Company, entered into an agreement titled *"Drake v. Ryan Satisfaction and Release"* (Agreement) with Gades and Progressive. In a classic *Drake v. Ryan* settlement agreement, the claimants "release[ ] the defendant and his primary liability insurer up to the limits of the primary liability coverage

1. In a *Drake v. Ryan* release, the claimant settles with the tortfeasor and the tortfeasor's primary insurer, but expressly reserves the right to pursue claims against an excess insurer for damages in excess of the primary insurance coverage limits, up to the policy limits of the excess insurance policy. *See* 514 N.W.2d at 786–87. The tortfeasor is not personally liable but remains a real party in interest in the action against the excess insurer. *See id.* at 788; *see also infra* § 1 for a full discussion of the facts and holding of *Drake v. Ryan*.

but ... expressly retain[ ] the right to pursue their claims against the defendant for additional damages up to the limits of the defendant's excess liability insurance coverage." *Drake*, 514 N.W.2d at 786.

This case turns on the meaning of the Agreement that Progressive and Gades entered into with the Booths. The Agreement provides, in part, as follows:

> 2. Thomas Booth, Angela Booth hereby agree to accept the $50,000 from Progressive and agrees the receipt of said $50,000 will operate as a partial satisfaction of any claims Thomas Booth, Angela Booth may have against Ryan Gades to the extent of the first $50,000 which may be adjudged against [ ] Ryan Gades, and further, as satisfaction of all claims against Ryan Gades in excess of the limits of the excess automobile insurance policy issued by Auto Owners.
>
> . . . .
>
> 4. Thomas Booth, Angela Booth specifically reserve any and all claims they may have against [ ] Ryan Gades up to the limits of the excess policy issued by Auto Owners and Thomas Booth, Angela Booth specifically agree that Thomas Booth, Angela Booth will satisfy any judgment Thomas Booth, Angela Booth may recover against Ryan Gades in excess of the limits of the policy issued by Progressive only out of the proceeds of the excess automobile insurance policy issued by Auto Owners to the extent of remaining coverage under that policy.
>
> . . . .
>
> 6. It is the intent of the parties that this Agreement be governed and con-

strued in accordance with the holdings in *Tiegan* [*Teigen*] *v. Jelco of Wisconsin* [124 Wis.2d 1], 367 N.W.2d 806 (Wis. 1985),[2] *Loy v. Bunderson* [107 Wis.2d 400], 320 N.W.2d 175 (Wis.1982) and *Drake v. Ryan*, 498 N.W.2d 29 (Minn.Ct. App.1993) *affirmed* 514 N.W.2d 785 (Minn.1994).

> 7. In the event the courts of the State of Minnesota do not give effect to this Agreement pursuant with holdings in [*Teigen*], *Loy*, and *Drake*, Thomas Booth, Angela Booth nonetheless agree to waive any action of any kind arising from the 01/25/06 motor vehicle accident against Progressive and Ryan Gades, except to the extent of excess coverage provided to Ryan Gades by Auto Owners. Thomas Booth, Angela Booth further agree to indemnify and hold Progressive harmless from any and all claims for costs and reasonable attorney's fees which may be brought against Progressive by Auto Owners during the course of providing a defense against Thomas Booth's personal injury claims.
>
> 8. The parties to this Release hereby acknowledge and agree this Agreement should not be construed as or have the legal effect of a *Pierringer* Release, a *Bartels* Release or general release.

The Auto–Owners insurance policy mentioned in the Agreement was the City's automobile insurance policy. The Agreement made no other reference to potential claims against the City. The parties do not contest in this appeal that the City's insurance policy with Auto–Owners does not cover Gades.[3] It is also undisputed

---

**2.** The case the parties refer to is *Teigen v. Jelco of Wisconsin, Inc.*, 124 Wis.2d 1, 367 N.W.2d 806 (1985). For clarity, we will refer to the case as *Teigen*.

**3.** The policy provides, "**We** will pay damages for **bodily injury** and **property damage** for which **you** become legally responsible be-

cause of or arising out of the ownership, maintenance or use of **your automobile** (that is not a **trailer**) as an **automobile**." The "**you**" referred to in the Auto–Owners policy is "the first named **insured** shown in the Declarations" which, in this case, is the City. The policy covers bodily injuries or property

that if the policy had covered Gades, it would have provided excess bodily injury coverage up to $300,000.

In November 2007, the Booths commenced an action against both Gades and the City, alleging that Gades was negligent in the operation of his motor vehicle and that the City was vicariously liable for this negligence. The City moved for summary judgment, arguing that, because Gades did not qualify for excess insurance coverage under the Auto–Owners policy, the Agreement released the Booths' claims against him in full and, because the claims against its agent Gades were released, the claims against the City as his principal were also necessarily released. The Booths did not argue that the Auto–Owners policy covered Gades, but rather argued that the Agreement did not fully release all of the Booths' claims against Gades. They also argued that even if the Agreement operated to release Gades, they could nevertheless proceed on a vicarious liability claim against the City.[4]

The district court granted summary judgment in favor of the City. The court reasoned that Gades had been fully released under the Agreement and "because there are no excess claims that may be brought against Mr. Gades, it follows that there can be no claims of vicarious liability against the City of Cyrus as well."

The Booths appealed the district court's grant of summary judgment and the court of appeals reversed. *Booth,* 771 N.W.2d at 70, 74. The court of appeals interpreted

the Agreement as setting a monetary limit on the claims that may be pursued against the City, but concluded it did "not limit the reservation of claims to only those for which excess coverage is actually provided to firefighter." *Id.* at 73. As such, the court of appeals reasoned "the release only limits Booth's *source of recovery* from firefighter to excess coverage available to firefighter" and thus "the release does not constitute a full and final release of all claims against firefighter even though there is no source from which Booth can collect any additional damages from firefighter." *Id.* Moreover, the court of appeals explained that, although the Auto–Owners policy was the only preserved collection source for a judgment against Gades, the Agreement did not limit collection sources for any judgment the Booths might obtain from a party other than Gades. *Id.* at 73 n. 3. Accordingly, the court of appeals reversed the district court's grant of summary judgment, concluding that the Booths could pursue their vicarious liability claims against the City. *Id.* at 74. The City appealed and we granted its petition for review.

## I.

■ We first consider whether the Agreement releases the Booths' claims against Gades. The Booths argue that the Agreement operates as a *Drake v. Ryan* release, the effect of which is to allow Gades to remain a "real party in interest" in this case, notwithstanding the release

damage arising out of the use of "**your automobile**," which is defined as "the **automobile** described in the Declarations." The Declarations page contains a listing of all the motor vehicles covered by the policy. The truck Gades was driving at the time of the accident is not listed in the Declarations.

**4.** The Booths also argued that the Agreement had been based on a mutual mistake and that

if they had realized that Gades was not covered by the policy, the Agreement would have contained different language. Although the Booths made the mutual mistake argument to the district court, the district court did not address it. Because the parties have not pursued this issue on appeal, we consider it waived.

language in the Agreement. *See Drake v. Ryan,* 514 N.W.2d 785, 788 (Minn.1994) (holding that the tortfeasor "has a current, genuine interest in this litigation and remains a real party in interest" because the outcome could affect his driver's record and insurance rates and "because the question of his negligence has not been decided"). The construction of the Agreement, like any other release or covenant not to sue, is governed by the rules of contract construction and, as such, is a question of law, subject to de novo review. *See Karnes v. Quality Pork Processors,* 532 N.W.2d 560, 562 (Minn.1995); *Turner v. Alpha Phi Sorority House,* 276 N.W.2d 63, 66 (Minn.1979).

Because our decision in *Drake v. Ryan* is the focus of the parties' arguments, we turn first to a detailed discussion of that case. *Drake* arose out of a car accident in which Ione Drake was injured when her car was rear ended by a car driven by James Ryan and owned by James Ryan's brother, Richard Ryan. 514 N.W.2d at 786. Richard Ryan's car was insured by Dairyland Mutual Insurance Company under a policy with liability limits of $30,000 per injury. *Id.* James Ryan was an additional insured under this policy. *Id.* James Ryan was also insured under a State Farm Mutual Automobile Insurance Company policy, which had liability limits of $50,000 per injury and provided excess coverage when its insured was operating a non-owned automobile. *Id.* Drake and her husband brought a negligence action against James Ryan and Richard Ryan. *Id.* Dairyland, as the primary insurer, provided the Ryans' defense. *Id.*

Before trial, Dairyland offered to settle for $20,000, which was $10,000 less than its policy coverage, in exchange for a release from the action. *Id.* Dairyland and the Drakes entered into an agreement, modeled after the agreement in *Loy v. Bunderson,* 107 Wis.2d 400, 320 N.W.2d 175 (1982),[5] in which the Drakes agreed to

---

**5.** In *Loy v. Bunderson,* 107 Wis.2d 400, 320 N.W.2d 175, 178 (1982), the Wisconsin Supreme Court approved of a "special release," which released the insured/tortfeasor and primary insurer from liability in exchange for a settlement of $20,000 from the primary insurance policy (which had coverage limits of $50,000), while preserving an action against a secondary insurer for any damages that a jury might award over $50,000 up to the secondary insurer's $500,000 policy limits. Because Wisconsin has a direct action statute, allowing the injured plaintiff to proceed directly against the insurance company, the tortfeasor was completely released from the action and the claimant proceeded directly against the secondary insurer. *Id.* at 187. The secondary insurer objected to this arrangement, but the court approved of the agreement. The court explained that the secondary insurer was not at all prejudiced by the agreement and that the primary insurer was only fulfilling its contractual obligations in taking up the defense and could not be held liable for any more than it contracted to pay under the release. *Id.* at 185–86. The court further pointed out that the secondary insurer was not technically "an excess insurer which had the opportunity, consciously, to adjust its premium rates on the basis that there was an underlying policy," but instead was merely a secondary insurer that had the obligation to defend *ab initio* any lawsuits and to "pay from 'dollar-one'" any damages; therefore, the "special release" could not be said to have prejudiced the secondary insurer in any manner. *Id.* at 185.

In *Teigen v. Jelco of Wisconsin, Inc.,* 124 Wis.2d 1, 367 N.W.2d 806 (1985), the Wisconsin Supreme Court held that *Loy v. Bunderson,* applies even if the second policy is a true excess insurance policy. In *Teigen* the excess insurer challenged the dismissal of a primary insurer from the action following the execution of a *Loy* release and pointed out that, unlike in *Loy,* its policy premium was "calculated with the expectation that the cost of defense of any claim would be borne by ... the primary carrier." 367 N.W.2d at 809. Accordingly, the excess insurer in *Teigen* argued that a *Loy* release would unfairly prejudice its rights by allowing the primary insurer to force it to defend the lawsuit without pay-

accept Dairyland's $20,000 settlement offer in satisfaction of the first $30,000 worth of claims against the Ryans. *Drake,* 514 N.W.2d at 786. The Drakes further agreed that the Ryans would have no personal liability, while reserving any excess claims that they might have against the Ryans up to the $50,000 limit of the State Farm policy and providing that they would satisfy any judgment that they might obtain in excess of $30,000 only from the proceeds of that policy. *Id.* The Drakes stipulated to a dismissal with prejudice of all the claims against Richard Ryan. *Id.* at 787.

James Ryan, on behalf of his excess insurer State Farm, then moved for summary judgment. *Id.* He argued that the settlement agreement fully released him from liability and contended that, because insurance policies in Minnesota are contracts for indemnity, if he was fully released from the actions, then his excess insurer must also be released because there was no longer a justiciable controversy. *Id.* at 787–88.

The question of whether James Ryan was fully released came to our court on appeal from certified questions. *Id.* at 787. We framed the issue as

> whether a defendant is entitled to dismissal of the claims against him in a negligence action where the plaintiffs have fully released the defendant and his primary liability insurer up to the limits of the primary liability coverage but have expressly retained the right to pursue their claims against the defendant for additional damages up to the limits of the defendant's excess liability insurance coverage.

*Id.* at 786. We held that James Ryan was not fully released from all liability. *Id.* at 788. We explained that "rather than fully releasing [the defendant], the agreement merely served to protect his personal assets by limiting satisfaction of any judgment against him to the insurance coverage limits" and that he continued "to be a real party in interest." *Id.* (citation omitted) (internal quotation marks omitted).

The effect of a release like that at issue in *Drake v. Ryan* is to allow an injured plaintiff to settle with the tortfeasor but preserve the ability to continue the action against an excess liability insurer. *See id.* at 790. The parties attempted this scenario in this case. But the parties concede for purposes of appeal that there is no excess insurance coverage applicable here.

 The Booths argue that they can proceed with this action even in the absence of excess insurance. We look to the language of the Agreement to determine what the parties intended in the event there was, as turned out to be the case, no excess insurance coverage. We do so because the Agreement, like any other settlement document, "is a contract, and we review the language of the contract to determine the intent of the parties." *Dykes v. Sukup Mfg. Co.,* 781 N.W.2d 578, 581–82 (Minn.2010) (citation omitted).

In paragraph 7 of the Agreement, the parties agreed that "[i]n the event the courts of the State of Minnesota do not give effect to this Agreement pursuant with holdings in [*Teigen*], *Loy* and *Drake,* [the Booths] nonetheless *agree to waive any action of any kind* arising from the 01/25/06 motor vehicle accident against Progressive and Ryan Gades, *except to the extent of excess coverage* provided to Ryan

---

ing up to the full policy limits of the primary policy. 367 N.W.2d at 809. The Wisconsin court rejected the excess insurer's arguments, explaining that partial settlements are favored

as a matter of law, that the primary insurer had met its obligations to the insured, and that each insurer had a duty to defend. *Id.* at 810–11.

Gades by Auto Owners." (Emphasis added.) In the plain language of paragraph 7 of the Agreement, the Booths clearly and unambiguously expressed their intent to release all claims of any kind that they had arising from the accident with Gades. *See Gronquist v. Olson*, 242 Minn. 119, 125, 64 N.W.2d 159, 163–64 (1954) (defining a "release" as a "relinquishment, concession, or giving up of a right, claim or privilege, by the person in whom it exists, to the person against whom it might have been enforced"). The only claims the Agreement preserved against Gades were those that the Auto–Owners policy covered. This intent is clearly expressed in the language of paragraph 7 of the Agreement where the scope of the release is limited "to the extent of excess coverage provided to Ryan Gades by Auto Owners."

That the parties intended the Booths to reserve only those claims for which there was excess insurance coverage is further confirmed elsewhere in the Agreement. For example, in paragraph 2, the Booths agreed that the $50,000 payment from Progressive operated to satisfy their claims against Gades "to the extent of the first $50,000 which may be adjudged against [ ] Ryan Gades, and further, as satisfaction of all claims against Ryan Gades in excess of the limits of the excess automobile insurance policy issued by Auto Owners." And in paragraph 4, which identifies the claims reserved in the Agreement, the Booths reserved only those "claims they may have

against [ ] Ryan Gades up to the limits of the excess policy issued by Auto Owners."

The plain language of the Agreement reflects the clear and unambiguous intention of the parties that all of the Booths' claims against Gades were released except for those claims covered by Auto–Owners. Because the parties concede on appeal that Auto–Owners did not provide coverage for Gades, the Booths reserved no claims, and we therefore hold that the Agreement operates as a release of all claims against Gades.

## II.

The Booths argue that even if we hold, as we have, that the Agreement fully released Gades, they can nevertheless continue with a claim against the City under the theory of vicarious liability. We disagree. The Booths do not claim that the City is independently liable because of its own negligence. The Booths' claim is that the City is vicariously liable for the torts of its firefighter, Gades, who was acting within the scope of his duties as a firefighter when the accident happened. *See* Minn. Stat. § 466.02 (2008) ("[E]very municipality is subject to liability for its torts and those of its officers, employees and agents acting within the scope of their employment or duties."). The well-established common law rule is that the release of the agent releases the principal from vicarious liability.[6] *See, e.g., Reedon of Faribault, Inc. v. Fid. & Guar. Ins. Underwriters,*

---

6. This is generally acknowledged as the common law rule across the country. *See, e.g., Theophelis v. Lansing Gen. Hosp.*, 430 Mich. 473, 424 N.W.2d 478, 480 (1988) (plurality opinion) ("At common law a valid release of an agent for tortious conduct operates to bar recovery against the principal on a theory of vicarious liability, even though the release specifically reserves claims against the principal."); *Burke v. Webb Boats, Inc.*, 37 P.3d 811, 812–13 (Okla.2001) (explaining the common law rule that, where the servant is re-

leased, the plaintiff cannot recover from the master under a theory of vicarious liability); *Estate of Williams v. Vandeberg*, 620 N.W.2d 187, 189 (S.D.2000) (describing the "majority" rule that the release of the servant releases the master); *see generally* Vitauts M. Gulbis, Annotation, *Release of, or Covenant Not to Sue, One Primarily Liable for Tort, but Expressly Reserving Rights Against One Secondarily Liable, As Bar to Recovery Against Latter,* 24 A.L.R.4th 547 (1983) (discussing the common law rule and variations thereof).

*Inc.*, 418 N.W.2d 488, 491 (Minn.1988) (holding that the release of the insurer's agent also released the principal from vicarious liability); *Serr v. Biwabik Concrete Aggregate Co.*, 202 Minn. 165, 177, 278 N.W. 355, 362 (1938) (explaining that it is "well established" that the valid release of the servant releases the master). We acknowledge that some jurisdictions in recent years have moved away from the common law rule that the release of the agent releases the principal. *See, e.g., Woodrum v. Johnson*, 210 W.Va. 762, 559 S.E.2d 908, 918 (2001) (rejecting the common law rule and holding that "a plaintiff's voluntary settlement with and release of a defendant who is primarily liable for the plaintiff's injury does not operate to release parties defendant whose liability is vicarious or derivative based solely upon their relationship with the settling defendant"). But we have long recognized this as the rule in Minnesota. *See, e.g., Reedon*, 418 N.W.2d at 491; *Serr*, 202 Minn. at 177, 278 N.W. at 362.

Notwithstanding *Reedon* and *Serr*, the Booths argue that we should depart from the common law rule in this case. The Booths support their argument with cases that stand for the proposition that the release of one tortfeasor does not automatically release other joint tortfeasors. *See, e.g., Gronquist v. Olson*, 242 Minn. 119, 128, 64 N.W.2d 159, 165 (1954) (discussing the relevant considerations in determining whether the release of one joint tortfeasor releases another joint tortfeasor); *cf. Dykes v. Sukup Mfg. Co.*, 781 N.W.2d 578, 582 (Minn.2010) (explaining that, although historically the release of one joint tortfeasor released all other joint tortfeasors, the court has since modified the common law rule). But these cases are inapposite because, although joint tortfeasors are independently liable, the City is only vicariously, that is derivatively, liable. *See Serr*, 202 Minn. at 177, 278 N.W. at 362 (explain-

ing that the release of the servant releases the master because the master's liability is derivative only); *Theophelis v. Lansing Gen. Hosp.*, 430 Mich. 473, 424 N.W.2d 478, 482 (1988) (plurality opinion) ("However, common-law rules which once governed contribution rights among joint and concurrent tortfeasors should not be confused with the deeply rooted common-law doctrine that release of an agent discharges the principal from vicarious liability. The rationale for the latter rule is entirely different and is grounded on the very nature of the principal's derivative liability."); *Biddle v. Sartori Mem'l Hosp.*, 518 N.W.2d 795, 798 (Iowa 1994) (distinguishing between the "full recovery" permitted by joint and several liability and the "limitations inherent" in vicarious liability).

The Booths also argue that we should not apply the common law rule because the sole basis for the common law rule was courts' desire to avoid a circuity of obligation. *See Nat'l Hydro Sys. v. M.A. Mortenson Co.*, 529 N.W.2d 690, 693 (Minn.1995) ("A circuity of obligation is created when, by virtue of pre-existing indemnity agreements or obligations, the plaintiff is in effect obligated to indemnify the defendant for claims including the plaintiff's own claim. In such a situation, the plaintiff's right to recover damages from the defendant is offset by the plaintiff's obligation to repay the same damages to the defendant." (citations omitted)). For example, if the plaintiff enters into a settlement agreement releasing the primarily liable tortfeasor employee and then the plaintiff sues the secondarily liable employer of the tortfeasor, this causes a circuity of obligation if the normal rules of indemnification apply and the employer can sue the tortfeasor employee for indemnification. *See Horejsi v. Anderson*, 353 N.W.2d 316, 319 (N.D.1984) (explaining that a " 'covenant not to sue would be

wholly abortive of its intended object and purpose if it went no further than to protect the employee against a direct action by the injured party but afforded no protection against an action over by his employer' " (quoting *Holmstead v. Abbott G.M. Diesel, Inc.*, 27 Utah 2d 109, 493 P.2d 625, 628 (1972))). In light of this circuity of obligation, which nullifies the effectiveness of the settlement agreement, courts, including our court, have interpreted agreements releasing the agent as also releasing the principal. *See, e.g., Reedon,* 418 N.W.2d at 490 (explaining that, "[s]ince Palmer's liability as an agent and [his employer's] status as a true vicarious indemnitee are not in dispute, Palmer would not benefit from a release which left it open to an indemnity suit").

The Booths argue that avoidance of a circuity of obligation cannot serve as a justification for applying the common law rule in this case because the City would have no right to sue Gades for indemnification; rather, the City was statutorily obligated to defend and indemnify Gades and had no right to recover damages from him. *See* Minn.Stat. § 466.07 (2008) (requiring a municipality to defend and indemnify its employees); Minn.Stat. § 471.86 (2008) (requiring a city to defend and indemnify its firefighters). Therefore, the Booths point out, even if we allow the vicarious liability action to proceed against the City, there would be no danger that the City would bring an indemnification action against Gades.

We have, however, never held that avoidance of a circuity of obligation is necessary, or the only reason, for the application of the common law rule. *See, e.g., Reedon,* 418 N.W.2d at 490–91 (discussing a variety of reasons, including avoidance of a circuity of obligation, for the court's decision); *Serr,* 202 Minn. at 177, 278 N.W. at 362 (highlighting the derivative nature of the master's liability).

Instead, as the City suggests, the application of the common law rule has been justified on other bases as well.[7] For example, many courts justify this rule based on the nature of derivative liability itself in addition to, or instead of, a circuity of obligation. *See, e.g., Theophelis v. Lansing Gen. Hosp.,* 430 Mich. 473, 424 N.W.2d 478, 482 (1988) (plurality opinion) (explaining that the common law rule that the release of the agent discharges the principal "is grounded on the very nature of the principal's derivative liability"); *Dickey v. Estate of Meier,* 188 Neb. 420, 197 N.W.2d 385, 387–88 (1972) (holding that, because the employer's liability was purely derivative, the release of the employee also must necessarily release the employer, even if the release specifically reserves all claims against the employer); *Horejsi v. Anderson,* 353 N.W.2d 316, 318 (N.D.1984) ("Because this percentage of negligence represents the 'single share' of liability covered by the common liability of the master and servant, the master is necessarily released from vicarious liability

7. *See* V. Woerner, Annotation, *Release of (or Covenant Not to Sue) Master or Principal as Affecting Liability of Servant or Agent for Tort, or Vice Versa,* 92 A.L.R.2d 533, 552 (1963) ("In a number of cases the courts, although recognizing the distinction between a release and a covenant not to sue as applied to joint tortfeasors generally, have taken the view that where the liability of a master or principal for a tort committed by his servant or agent arises solely under the doctrine of respondeat superior, the injured person's covenant not to sue the servant or agent operates to release the master or principal from liability ... based either upon the theory that it will avoid circuity of action, or upon the theory that since the liability of the master or principal is merely derivative and secondary, exoneration of the servant or agent removes the foundation upon which to impute negligence to the master or principal, or upon both theories.").

for the released servant's misconduct."); *Estate of Williams v. Vandeberg,* 620 N.W.2d 187, 190 (S.D.2000) ("A 'single share' theory for liability results in the treatment of both agent and principal as one .... Therefore, the plaintiff cannot recover against the principal once recovery against the agent has been completed."). We have relied on both rationales in the past in justifying the application of the common law rule. *See Reedon,* 418 N.W.2d at 490; *Serr,* 202 Minn. at 177, 278 N.W. at 362.

We find further support for the conclusion that a release of Gades acts as release of the City in Minn.Stat. § 471.86, which codifies the City's common law obligations to defend and indemnify its firefighters. Under the statute, the City is required to provide defense counsel to firefighters sued for injuries that arise "out of the operation of a motor vehicle by such firefighter in the performance of official duties" and is required, "[i]f judgment is rendered against the firefighter, ... [to] appropriate money from any funds available to pay such judgment." *Id.,* subd. 2. This statute requires the City to pay damages for the torts of its firefighter if "judgment is rendered against the firefighter." *Id.* In this case, if Gades is fully released, then no judgment can be rendered against him and the City is not obligated to pay damages under Minn.Stat. § 471.86.

Based on our common law rule and in accord with the City's statutory liability, the City's liability can be no greater than Gades' liability. *See Serr,* 202 Minn. at 177, 278 N.W. at 362; Minn.Stat. § 471.86. We therefore hold that the Booths' release of Gades also released the City.[8]

Reversed.

8. At oral argument, the City appeared to agree that it was theoretically possible for a release to reserve a vicarious liability claim. We have no occasion to address that issue in this case, however, because the Booths did not reserve any claims in this case other than the one for coverage provided by Auto–Owners.

STRAS, J., not having been a member of this court at the time of the argument and submission, took no part in the consideration or decision of this case.