### RICKETTS v. PENNSYLVANIA R. CO.
### No. 122.

Circuit Court of Appeals, Second Circuit.

Jan. 10, 1946.

---

758

SWAN, Circuit Judge, dissenting.

———◆———

Ray Rood Allen and Burlingham, Veeder, Clark & Hupper, all of New York

City (G. Hunter Merritt, of New York City, of counsel), for appellant.

Robert Leon Horn, of New York City (Harold Bloom, of New York City, of counsel), for appellee.

Before L. HAND, SWAN, and FRANK, Circuit Judges.

L. HAND, Circuit Judge.

The defendant appeals from a judgment awarding damages to the plaintiff—a waiter upon one of its dining cars—for injuries suffered while in its service on February 16, 1943. The action was brought under the Federal Employers' Liability Act, §§ 51–60, Title 45 U.S.C.A.; but the only question raised upon this appeal concerns the validity of two releases, dated August 23, 1943, by which the plaintiff released all claims against the defendant upon the payment of $600. The plaintiff had already executed a release for $150 in the same words on March 19, 1943, and one of the two releases of August 23, recited a payment of $750, the sum of the two payments; but, as that release plays no part in the result we shall ignore it and speak as though only the second release had been given in August. The plaintiff testified that he executed the first release after a talk with one, Brown, the defendant's claim agent, who told him that the payment of $150 was only for the tips and wages which he had lost; and that, relying upon this representation, he did not read the release, but signed it as Brown told him to do. Between that time and July he made some efforts to work but still felt incapacitated; and towards the end of that month, or early in August, he went again to Brown asking for more money. They could not agree, and he left, saying to Brown: "Well, I will have to get somebody to get all my tips and everything, my salary, because that is what I am getting." He then went to an attorney named Reich, who, after talking to Brown on the telephone, later brought to the plaintiff the release drawn on the defendant's form and told him: "I was just to sign a receipt for the amount of money that I got for the time I was off, my tips also included, to go back to work and they won't have anything against you * * * he had the word from the Pennsylvania that I will be taken care of." On his redirect he somewhat amplified this. Reich had told him: "the $600 is just for my earnings and my tips, because that would be better such and such. He

said he did not want to sue. He said that would be better, and the company wants you to sign. That is big money. If you do, they won't have anything against you. Since you stay in the company, you have eligibility to be retired. You will have full retirement pay." Relying upon this, and again not reading the release, he signed it and the defendant paid him $600. The plaintiff's wife also testified that Reich had said that "the money was for his back pay and tips."

This version of the transaction the defendant denied. It called Reich, who said that Brown, when Reich consulted him, agreed to pay $600 for a complete release; and that all this Reich explained to the plaintiff when the release was executed. The judge charged the jury that, if the plaintiff executed the release "without fraud or misrepresentation, and understanding what he was doing," it bound him, but that if he "signed these papers as receipts for wages, if it was as his understanding that that was all he was signing, that he did not sign any general release, then, of course you take up the question of damages." Again: "Was it represented to the plaintiff by his lawyer that the papers he signed on August 23, 1943, were releases of all claims or only for lost wages?" The defendant made several requests to charge, but in none of them did it suggest that the jury should find whether the plaintiff retained Reich to settle all claims he had against the railroad, or whether—as the plaintiff testified—Reich's retainer was limited to collecting wages and tips.

■■ The right of action here in suit was created by act of Congress, and it is abundantly settled that its interpretation is a matter of federal law and not governed by state decisions, even when it speaks in the words of the common-law. Chesapeake & Ohio R. Co. v. Kuhn, 284 U.S. 44, 52 S.Ct. 45, 76 L.Ed. 157. It would not inevitably follow that, after such a right had come into existence, the legal effect upon it of a transaction within a state—as here, of a release—was also to be treated as matter of federal law; conceivably, its fate might be left to the law of the state. However, as we read Garrett v. Moore-McCormack Co., 317 U.S. 239, 63 S.Ct. 246, 87 L.Ed. 239, this is not so. The right of action was there under the Jones Act, but the action had been brought in a state court, which had held that the burden of proof of establishing a release was governed by the law of Pennsylvania. This the Supreme Court denied, holding that the admiralty rule controlled; and it would seem to follow that the validity of the release at bar is to be decided by the common-law, to be gathered from the same sources which, before Erie Railroad Co. v. Tompkins, 304 U.S. 64, 58 S. Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487, we used to employ in cases depending on diversity of citizenship.

■ Although the law was at one time otherwise, at least in this country (Friedlander v. Texas & Pacific R. Co., 130 U.S. 416, 9 S.Ct. 570, 32 L.Ed. 991), it is now settled both in the federal system (Gleason v. Seaboard Airline R. Co., 278 U.S. 349, 49 S.Ct. 161, 73 L.Ed. 415), and in England (Lloyd v. Grace, Smith & Co., [1912] A.C. 716), that an agent does not cease to be acting within the scope of his authority when he is engaged in a fraud upon a third person. That has probably always been the more generally accepted doctrine. Fifth Avenue Bank v. Forty-Second Street & G. St. Ferry R. Co., 137 N.Y. 231, 33 N. E. 378, 19 L.R.A. 331, 33 Am.St.Rep. 712; Ripon Knitting Works v. Railway Express Agency, 207 Wis. 452, 240 N.W. 840; Tollett v. Montgomery Real Estate & Insurance Co., 238 Ala. 617, 622, 193 So. 127; Restatement of Agency, § 262. We can see no distinction in principle between that situation and one in which the agent deceives, not the third person, but his principal. The reason in each case for holding the principal is that the third person has no means of knowing that the agent is acting beyond his authority, and it is a matter of entire indifference whether the agent adds deception of his principal to deception of the third person; for it is obviously true that for the agent consciously to exceed his powers is to deceive the third person. Hence we may assume in the case at bar that, if the plaintiff had retained Reich to settle any claim he might have against the defendant, the plaintiff would have been bound, if Reich had procured the execution of the release by deceiving him as to its contents.

■ On the other hand, if the plaintiff retained Reich merely to collect his wages and tips, as to which he had failed to come to a satisfactory agreement with Brown in July or early August, the release was invalid; for, whatever may be the law in England, it is well settled in this

country that an attorney has no implied authority to compromise a claim. Holker v. Parker, 7 Cranch 436, 452, 453, 3 L.Ed. 396; United States v. Beebe, 180 U.S. 343, 351, 352, 21 S.Ct. 371, 45 L.Ed. 563; Glover v. Bradley, 4 Cir., 233 F. 721, Ann.Cas. 1917A, 921; McFarland v. Curtin, 4 Cir., 233 F. 728; Barber-Colman Co. v. Magnano Corp., 1 Cir., 299 F. 401; Jacob v. City of New York, 2 Cir., 119 F.2d 800 (reversed as to a different cause of action in Jacob v. City of New York, 315 U.S. 752, 62 S. Ct. 854, 86 L.Ed. 1166); Countryman v. Breen, 241 App.Div. 392, 394, 271 N.Y.S. 744, affirmed 268 N.Y. 643, 198 N.E. 536. The release would still be invalid even though the plaintiff signed it without reading it, for he would have been justified in relying upon what his lawyer told him of the contents. The theory upon which a document binds one who signs it, but who does not read it, is that either he accepts it whatever may be its contents, or that he has been careless in choosing his informant. Foster v. Mackinnon, L.R. 4 C.P. 704; Pimpinello v. Swift & Co., 253 N.Y. 159, 170 N.E. 530; Chapman v. Rose, 56 N.Y. 137, 15 Am.Rep. 401; Williston, § 95A. In the case at bar, whatever we may think about the correctness of the verdict on the facts, the jury could have interpreted the plaintiff's testimony to mean that he only told Reich to collect his wages and tips; which incidentally was consistent with his parting words to Brown. Indeed, it was not really possible to believe the words which he put in Reich's mouth, unless he had retained him for that limited purpose. At any rate, if the defendant had meant to raise the question whether Reich had been broadly commissioned, it should have done so by a proper request. This it did not do; and the result is that upon this, the turning point in the case—the extent of Reich's authority—the only question that remains upon this appeal is of the sufficiency of the evidence to support a verdict. It is true that the plaintiff did not offer to return the money received in March and in August, 1943; since however the defendant did not raise this point either in its answer, at the trial, or in this court, we have not considered it.

Judgment affirmed.

FRANK, Circuit Judge (concurring).

1. Plaintiff, as a result of a railroad accident which occurred while he was working as an employee of the Pennsylvania Railroad Company, suffered personal injuries which turned out to be so serious that the jury returned a verdict in his favor for $7,500, which the Railroad Company does not contest—except on one ground, i. e., that his claim was barred by a release he gave the company on payment to him of one-tenth that sum, or $750. That smaller sum represents merely the approximate amount of his lost earnings up to the date of the release. When he signed the release, he could not read it because of the effects of the accident, and without negligence on his part—since he relied on his own lawyer who mis-informed him—he understood that it purported to be only a receipt for payment of those lost earnings.

Judge HAND says (and I entirely agree) that the evidence sufficiently shows. that the lawyer acted beyond his authority. Accordingly, it is as if a non-lawyer, carefully selected by plaintiff, had erroneously interpreted the release to him. The case thus comes within the category, described by Williston,[1] of non-negligent unilateral mistakes preventing the formation of valid contracts. Accepting Williston's analysis, Judge HAND'S rationale seems to me to be impregnable.

But I am not content to rest the decision on that analysis, because I think that that analysis leads to needless complexities which will confront us in future cases. The Supreme Court recently, in a case (cited by Judge HAND) relating to a release by a seaman, Garrett v. Moore-Mc-Cormack Co., 317 U.S. 239, at page 248, 63 S.Ct. 246, 87 L.Ed. 239, note 17, has broadly hinted that the courts should treat non-maritime employees, with respect to releases of personal injury claims, just as they treat seamen. I think we should take that hint, and, in doing so, should reject many of the finespun distinctions made by Williston and expressed in the Restatement of Contracts. Since I believe that not only is an important social policy involved but also that a good opportunity offers itself to uncomplicate an excessively complicated set of legal rules, I shall state, in some detail, my reasons for this conclusion.

2. In the early days of this century a struggle went on between the respective proponents of two theories of contracts, (a) the "actual intent" theory—or "meeting of the minds" or "will" theory—and

---

[1] Williston, Contracts (Rev.Ed.) § 95A.

(b) the so-called "objective" theory.[2] Without doubt, the first theory had been carried too far: Once a contract has been validly made, the courts attach legal consequences to the relation created by the contract, consequences of which the parties usually never dreamed—as, for instance, where situations arise which the parties had not contemplated.[3] As to such matters, the "actual intent" theory induced much fictional discourse which imputed to the parties intentions they plainly did not have.

But the objectivists also went too far. They tried (1) to treat virtually all the varieties of contractual arrangements in the same way, and (2), as to all contracts in all their phases, to exclude, as legally irrelevant, consideration of the actual intention of the parties or either of them, as distinguished from the outward manifestation of that intention. The objectivists transferred from the field of torts that stubborn anti-subjectivist, the "reasonable man";[4] so that, in part at least, advocacy of the "objective" standard in contracts appears to have represented a desire for legal symmetry, legal uniformity, a desire seemingly prompted by aesthetic impulses.[5] Whether (thanks to the "subjectivity" of the jurymen's reactions and other factors) the objectivists' formula, in its practical workings, could yield much actual objectivity, certainty, and uniformity may well be doubted.[6] At any rate, the sponsors of

---

[2] Some adherents of the objective theory have suggested that the "actual intent" theory was undesirably transplanted into the common law, in the 19th century, from Roman-law dominated continental sources. See, e. g., Williston, Contracts (Rev. ed. 1936) §§ 20, 21, 94; cf. Patterson, Equitable Relief for Unilateral Mistake, 28 Col.L.Rev. (1928) 859, 861, 862, 883–890. The historical accuracy of that suggestion seems somewhat questionable to one who reads a 16th century English decision like Thoroughgood's Case, 1582, 2 Co.Rep. 9a, 76 Eng.Reprint 408, relating to a unilateral mistake. Sponsors of the "objective" theory did not, however, rest their case primarily on chauvinistic common law distaste for continental attitudes. Nor could they consistently have done so. For the "reasonable man," dear to the objectivists, seems to have been imported into the common law. Cf. Beidler & Bookmyer, Inc., v. Universal Insurance Co., 2 Cir., 134 F.2d 828, 830.

The "actual intent" theory, said the objectivists, being "subjective" and putting too much stress on unique individual motivations, would destroy that legal certainty and stability which a modern commercial society demands. They depicted the "objective" standard as a necessary adjunct of a "free enterprise" economic system. In passing, it should be noted that they arrived at a sort of paradox. For a "free enterprise" system is, theoretically, founded on "individualism"; but, in the name of economic individualism, the objectivists refused to consider those reactions of actual specific individuals which sponsors of the "meeting-of-the-minds" test purported to cherish. "Economic individualism" thus shows up as hostile to real individualism. This is nothing new: The "economic man" is of course an abstraction, a "fiction." See Doehler Metal Furniture Co. v. United States, 2 Cir., 149 F.2d 130, 132; cf. Standard Brands v. Smidler, 2 Cir., 151 F.2d 34, 38, notes 6 and 7.

Patterson (loc. cit. 878 note) says that the "direct ancestry of [the objective] theory goes back to Paley, * * * a theological utilitarian, a contemporary of Adam Smith."

[3] See Beidler & Bookmyer, Inc., v. Universal Insurance Co., supra; Kulukundis Shipping Co. v. Amtorg Trading Co., 2 Cir., 126 F.2d 978, 991, and note 43; United States v. Forness, 2 Cir., 125 F.2d 928, note 26; Zell v. American Seating Co., 2 Cir., 138 F.2d 641, 647.

[4] As to the lack of real objectivity attained through the use of that personage in the field of torts, and the vagueness of his personality, see the following articles by Dean Leon Green: The Duty Problem, 28 Col.L.Rev. 1014 (1928) and 29 Col.L.Rev. 255 (1929); The Negligence Issue, 37 Yale L.J. 1029 (1928); Rules of Causation, 77 Un. of Pa.L.Rev. 601 (1929). See these and other articles in his book, Judge and Jury (1930). Cf. Aikens v. Wisconsin, 195 U.S. 194, 204, 25 S.Ct. 3, 49 L.Ed. 154.

[5] See, e. g., Wolfson, Aesthetics In and About the Law, 33 Ky.L.J. (1944) 33; Cohen, Transcendental Nonsense and The Functional Approach, 35 Col.L.R. 809, 845; Cf. Becker, Some Problems of Legal Analysis, 54 Yale L.J. 809 (1945).

[6] See Zell v. American Seating Co., supra, 2 Cir., 138 F.2d at pages 641, 647, 648; In re J. P. Linahan, Inc., 2 Cir., 138 F.2d 650, 652, 653.

Perhaps the most fatuous of all notions solemnly voiced by learned men who ought to know better is that when legal rules are "clear and complete" litigation is unlikely to occur. See, e. g.,

complete "objectivity" in contracts [7] largely won out in the wider generalizations of the Restatement of Contracts [8] and in some judicial pronouncements.[9]

Influenced by their passion for excessive simplicity and uniformity, many objectivists have failed to give adequate special consideration to releases of claims for personal injuries, and especially to such releases by employees to their employers. Williston, the leader of the objectivists, insists that, as to all contracts, without differentiation, the objective theory is essential because "founded upon the fundamental principle of the security of business transactions".[10]

He goes to great lengths to maintain this theory, using a variety of rather desperate verbal distinctions to that end. Thus he distinguishes between (1) a unilateral non-negligent mistake in executing an instrument (i. e., a mistake of that character in signing an instrument of one kind believing it to be of another kind) and (2) a similar sort of mistake as to the meaning of a contract which one intended to make.[11] The former, he says, renders the contract "void"; [12] the latter does not prevent the formation of a valid contract. Yet in both instances "the fundamental principle of the security of business transactions" is equally at stake, for there has been the same "disappointment of well-founded expectations." [13] More than that, Williston concedes that a mistaken idea of one party as to the meaning of a valid contract (Williston's second category) "may, under certain circumstances, be ground for relief from enforcement of the contract." But he asserts that (a) such a contract is not "void" but "voidable," and (b) that the granting of such relief is no exception to the objective theory, because this relief "is in its origin equitable," and "equity" does not deny the formation of a valid contract but merely acts "by subsequently * * * rescinding" it.[14] His differentiation, moreover, of "void" and "voidable" has little if any practical significance: He says that a "voidable" contract will be binding unless the mistaken party sets up the mistake as a defense; [15] but the same is obvi-

---

Kantorowicz, Some Rationalism about Realism, 43 Yale L.J. (1934) 1240, 1241; Dickinson, Legal Rules, 79 Un. of Pa. L.Rev. (1931) 833, 846, 847.

Such writers surely cannot be unaware that thousands of decisions yearly turn on disputes concerning the facts, i.e., as to whether clear-cut legal rules were in fact violated. It is the uncertainty about the "facts" that creates most of the unpredictability of decisions. See Frank, If Men Were Angels (1942) Chaps. VI and VII and Appendices II and V. Cf. Maine, Early History of Institutions (1875) 48–50; Maine, Village Communities (4th ed. 1881) 311–312, 318; Zell v. American Seating Co., 138 F.2d at pages 647, 648; cf. In re J. P. Linahan, 138 F.2d at pages 652–654.

[7] Williston, Contracts (Rev. ed.) § 35.

[8] See, e.g., Rest. §§ 70, 71 and 503.

[9] See, e.g., Hotchkiss v. National City Bank, D.C., 200 F. 287, 293.

[10] Williston, Contracts (Rev. ed.) § 23.
He cites § 21, with approval, Holland's Jurisprudence; Holland (13th ed.) 262, says that "when the law enforces a contract, it does so to *prevent disappointment of well-founded expectations*, which, though they usually arise from expressions truly representing intention, yet may occasionally arise otherwise." (Emphasis added.)

[11] § 1541.

[12] Ibid, §§ 94, 95A, 1535, 1541.

[13] See quotation from Holland, supra, note 10.

[14] Section 22, 94, 1537.

[15] §§ 15, 20, 1538.

Williston refused to concede that the mutual-mistake doctrine does not jibe with the "objective" theory. He perhaps had in mind this comment of Wigmore's on the reformation of a contract for such a mistake: "The theory of reformation is to make the instrument state, objectively and in appearance to others, what it did subjectively state to the parties themselves * * *" Wigmore, Evidence, § 2418; cf. § 2417. Williston, to whom all subjectivity was anathema, insisted that "the external expression" of the parties' "will," no matter how mistaken, results in a contract which "equity" recognizes as a contract but which, when the mistake is mutual, it sets aside because "it is just to do so." See Williston, The Formation of Contracts, 14 Ill.L.Rev. (1919) 85, 92, 94. However (in part because of the formal "merger" of "law" and "equity" but even in jurisdictions where no such merger has occurred) the "law" courts have often refused to enforce such contracts.

Williston, undoubtedly a master, takes a position here which seems highly casuistical: Since "equity"—whether adminis-

ously true of agreements which (because of unilateral mistakes affecting their "validity") he describes as "wholly void." [16]

It is little wonder that a considerable number of competent legal scholars have criticized the extent to which the objective theory, under Williston's influence, was carried in the Restatement of Contracts.[17] One of them, Whittier, says that the theory, in its application to the formation of contracts, is a generalization from the exceptional cases; he points out that the theory of "actual mutual assent" explains the great majority of the decisions, so that it would be better, he believes, to adhere to it, creating an exception for the relatively few instances where one party has reasonably relied on negligent use of words by the other. "Why not," asks Whittier, "say that actual assent communicated is the basis of 'mutual assent' except where there is careless misleading which induces a reasonable belief in assent?" [18] There may be much in that notion: Williston admits that "the law generally is expressed in terms of subjective assent, rather than of objective expressions * * *" [18a] and that "a doctrine which permits the rescission of a contract on account of a unilateral mistake approaches nearly to a contradiction of the objective theory * * *" [19] As able a judge as Cuthbert Pound said, not long ago, "The meeting of minds which establishes contractual relations must be shown." [20]

Another critic [21] suggests that, in general, Williston, because he did not searchingly inquire into the practical results of

---

tered in a separate court or in a court of "law"—departs from the objective appearance, the objective theory, for all practical purposes, cannot be said to be consistently applied in our legal system. It is far more helpful to acknowledge frankly that there exist important exceptions to that theory. Cf. Patterson, The Restatement of The Law of Contracts, 33 Col.L. Rev. (1933) 397, 407–408; Robinson, Law —An Unscientific Science, 44 Yale L.J. 235, 259–261.

There is a danger, that through the merger of "law" and "equity," the latter may lose its desirable elasticity. See Emmerglick, A Century of The New Equity, 23 Tex.L.R. (1945) 244. That danger may be augmented if, via the Restatement, the "objective" theory of contracts is not recognized as subject to exceptions.

[16] § 20. In § 1538, Williston concedes that his distinction between "void" and "voidable" will "be generally unimportant for the defendant from a practical standpoint * * *"

[17] See, e.g., Sharp, Williston on Contracts, 4 Un. of Chi.L.Rev. (1936) 30; Oliphant, Book Review, 19 Mich.L.Rev. (1938) 358; Whittier, The Restatement of Contracts and Mutual Assent, 17 Calif. L.Rev.(1929) 441; Cf. Patterson, The Restatement of The Law of Contracts, 33 Col. L.Rev. (1933) 397, 407–408; Robinson, Law—An Unscientific Science, 44 Yale L. J. (1934) 235, 259–261; Clark, The Restatement of The Law of Contracts, 42 Yale L.J. (1933) 643; Pound, An Introduction to the Philosophy of Law (1922) 282, 283.

[18] Whittier, loc. cit. 441, 443. Whittier cogently remarks (442 note 5): "All non-consensual legal obligations need not have identical bases either as to culpability or damage."

[18a] § 1536; see also § 1538.

[19] § 1579.

[20] 300 West End Ave. Corp. v. Warner, 250 N.Y. 221, 227, 228, 165 N.E. 271, 273.

[21] F. S. Cohen says that Williston, "a master of classical jurisprudence," in many of his formulations "has in mind neither the question of * * * prediction which the practical lawyer faces nor the question of values which the conscientious judge faces. If he had in mind the former question, his studies would no doubt reveal the extent to which courts actually enforce various types of contractual obligation. His conclusions would be in terms of probability and statistics. On the other hand, if Professor Williston were interested in the ethical aspects of contractual liability, he would undoubtedly offer a significant account of human values, and social costs involved in different types of agreement and in the means of their enforcement. In fact, however, the discussions of a Williston oscillate between a theory of what courts actually do and a theory of what courts ought to do, without coming to rest either on the plane of social realities or on the plane of values long enough to come to grips with significant problems. This confused wandering between the world of fact and the world of justice vitiates every argument and every analysis." Cohen, Transcendental Nonsense and The Functional Approach, 25 Col.L.Rev. (1935) 809, 840, 841.

Cf. Fuller and Perdue, The Reliance Interest in Contract Damages, 47 Yale L.J. (1936) 52.

many of his formulations, assumed, unwarrantably, without proof, that those results must invariably have a general social value, although (as Williston admits as to the objective theory) they are "frequently harsh."[21a]

In other realms of thought, attempted over-simplification has yielded complexities in practice.[22] So here, as appears from the following.

Fortunately, most judges are too common-sensible to allow, for long, a passion for aesthetic elegance, or for the appearance of an abstract consistency, to bring about obviously unjust results.[23] Accordingly, courts not infrequently have depart-

---

[21a] Loc. cit. § 35.

[22] See, e.g., Swan, What is Science? in Essays in Research in The Social Sciences (1931) 11.

The desperate efforts of Williston & Co. verbally to reconcile the decisions so as to avoid the appearance of exceptions recall Francis Bacon's remarks: "The human understanding, from its peculiar nature, easily supposes a greater degree of order and equality than it really finds * * * The human understanding, when any proposition has been once laid down (either from general admission or from the pleasure it affords), forces everything else to add fresh support and confirmation; and although most cogent and abundant instances exist to the contrary, yet either does not observe or despises them, or gets rid of and rejects them by some distinction, with violent and injurious prejudice, rather than sacrifice the authority of its first conclusions * * * The human understanding is most excited by that which strikes and enters the mind at once and suddenly, and by which the imagination is immediately filled and inflated. It then begins almost imperceptibly to conceive and suppose that everything is similar to the few objects which have taken possession of the mind, while it is very slow and unfit for the transition to the remote and heterogenous instances by which axioms are tried as by fire * * *" Bacon, Novum Organum (1620) Bk. I, §§ 45-47. It should not be forgotten that Bacon was well acquainted with legal thinking. Indeed, it has been suggested that Bacon, in furthering the logic of discovery or invention in the natural sciences was extending the logic used in the courts; see McKeon, Democracy, Scientific Method, and Action, 55 Ethics (1945) 235.

For a modern restatement of similar views, see Bridgman, The Intelligent Individual and Society (1938) 7, 8, 18-20, 22, 40-43, 54, 82-85, 96, 97, 108, 109, 190.

Bridgman says (54): "In general, the complete meaning of any concept is determined by the complex of its behavior when subjected to every possible operation. The complete meaning is of hopeless complexity, so that we are compelled to simplify and to approximate it

* * * But in practice this reduction to a few simple key operations is usually carried too far. We have over-simplified our conceptual situations, and a necessary task before we can hope for adequate understanding is to recover some of the primitive complexity." Whitehead suggests as a working rule, "Seek simplicity and distrust it." Cf. Tocqueville, Democracy in America (Bradley ed. 1945) II, First Bk., Chaps. 3 and 4, especially p. 17 as to the tendency to arrange "hastily * * * under one formula."

[23] Although some physicists, in their philosophic writings, display a burning passion for consistency, in practice the desire for consistency is not carried to excess in the physical sciences. "This important fact of the priority of the concrete material as test is graphically illustrated by familiar instances in the physics of light and of atomic nuclear structure where abstractly incompatible algebras, geometries, and theories of light are employed by the experimenter in order to achieve the concrete transformations at which his experiment aims. If in experimental inquiry consistency functioned as the fundamental test, then each experimenter would line up in one of (at least) two schools and refuse to investigate any phenomenon which could be approached only with the theory of the competing school. This does not mean that the physicist will not have his preferences or his favorite horse. But it does mean that until the specific difficulty has been resolved he will not let the lure of consistency interfere with any experiment which appears promising." Fries, Science and The Foundations of Freedom, 41 J. of Philosophy (1944) 113, 116-117. Cf. Schuetz, On Multiple Realities, 5 Phil. and Phenom. Research (1945) 533.

"That principle, theory or 'law' is dignified as scientific which best promotes the actual attainment or control of concrete transformations. To this end the experimenter will use Euclidean or non-Euclidean geometries, geometries of four dimensions and of six, ordinary algebra and systems in which ab does not equal ba; he will employ a quantum theory where it promises results along with an

ed from the objective theory when necessary to avoid what they have considered an unfair decision against a person who, for a small sum, signed a release without understanding either the seriousness of his injury or the import of the words of the release, provided (1) he was not "negligent" and (2) the other party (the releasee) had not, in reliance on the release, importantly "changed his position." [24] Some courts, in some of the mistake cases, frankly abandon the "objective" test, saying boldly that a non-negligent unilateral mistake justifies cancellation or rescission of a contract.[25] As New York, a lively center of commerce, at least to some extent allows relief for such unilateral mistakes,[26] it should be obvious that, contrary to Williston & Co., any deviation from the objective theory is not fatal to the functioning of business.

Some courts, however, escape marring the verbal symmetry of the objective theory, while actually abandoning it, thus: They say that a mistake by one party about a striking fact (sometimes called "palpable")[27] must be deemed to have been known to the other party, that, even if the evidence fails to show that he knew it, yet he had "reason to know it" and is therefore to be treated as if he did; so that there results, by this device, which comes close to a fiction, a "mutual mistake of fact."[28] This court, in pre-Erie-Tomp-

undulatory theory where it is productive." Fries, Liberty and Science, 3 Pub. Adm.Rev. (1943) No. 3.

[24] Sharp, in Williston on Contracts, 4 Un.Chi.L.Rev. (1936) 30, 36, 37, and in Notes on Contract Problems and Comparative Law, 3 Un. of Chi.L.Rev. (1936) 277, 282–285, questions whether negligence should bar rescission of any contract for unilateral or mutual mistake of fact; he suggests that the party resisting the relief should merely receive compensation for any actual loss he has suffered.

[25] In re Clark's Estate, 233 App.Div. 487, 253 N.Y.S. 524; Seidman v. New York Life Ins. Co., 162 Misc. 560, 296 N.Y.S. 55, 56; Rosenblum v. Manufacturers Trust Co., 270 N.Y. 79, 85, 200 N.E. 587, 105 A.L.R. 917; Harper, Inc., v. City of Newburgh, 159 App.Div. 695, 145 N.Y.S. 59; City of New York v. Seely-Taylor Co., 149 App.Div. 98, 133 N.Y.S. 808, affirmed on opinion below 208 N.Y. 548, 101 N.E. 1098; Meade v. Brown, 218 Mich. 556, 188 N.W. 514; Brown v. Lamphear, 35 Vt. 252; Murray et al. v. Sanderson, 62 Wash. 477, 114 P. 424.

[26] See New York Annotations to the Restatement of Contracts (1933) § 503.

[27] As to "palpable" mistakes, in non-release cases, see, e.g., Moffett, H. & C. Co. v. Rochester, 178 U.S. 373, 20 S. Ct. 957, 44 L.Ed. 1108; Armour & Co. v. Renaker, 6 Cir., 202 F. 901; State of Connecticut v. F. H. McGraw & Co., D.C., 41 F.Supp. 369; Geremia v. Boyarsky, 107 Conn. 387, 140 A. 749; St. Nicholas Church v. Kropp, 135 Minn. 115, 160 N.W. 500, L.R.A.1917D, 741; Tyra v. Cheney, 129 Minn. 428, 152 N. W. 835; Lubell, Unilateral, Palpable and Impalpable Mistakes in Construction Contracts, 16 Minn.L.Rev. 137; Patterson, article cited in note 2, supra; Williston, § 1578.

[28] This is the verbal device of the objectivists who formulated the Restatement of Contracts: § 503, Comment a and Illustration 1, says that a transaction is voidable even if one party only is under a mistake where the other party *"has reason to know* that there is a mistake when the transaction is entered into."* (Emphasis added.) The phrase "reason to know" is not defined in this Restatement. But in Restatement of Restitution § 10 comment d we are told to find the meaning of that phrase in the Restatement of Agency § 9. There, in comment c, "reason to know" is defined to include not merely the reaction of "a person of ordinary intelligence" but also of one who has "the superior intelligence" of the particular person in question.

However, Restatement of Restitution § 10(a) refers to the person's knowledge of facts or that "he suspected their existence"; and comment d says that "suspicion imports an advertence to the facts" and therefore an element of "bad faith" as distinguished from "reason to know"; the comment adds, "Suspicion cannot profitably be defined in more precise terms."

Compare Williams, Language and The Law, 61 L.Q.Rev. (1945), 179, 191, 192: "The upshot is that the words we use, though they have a central core of meaning that is relatively fixed, are of doubtful application to a considerable number of marginal cases. In general, we try in our language to sharpen our distinctions beyond what is warranted by the facts of the case. It is a necessary feature of language that we should have to make this effort, and thus it is inevitable that our linguistic distinctions should constantly break down * * * A wag once inquired whether the difference between a difference of kind and a difference of degree is itself a differ-

kins days, in effect adopted that rule in a case where the plaintiff, before executing the release, had consulted her own physician.[28a] That thesis has been utilized especially when an employee has given a release to his employer [29] of all claims for an injury in consideration of a sum which approximates his lost wages (or his lost wages and medical expenses) and no more. Many courts have said that, on such a state of facts, it is impossible to believe that the releasor and releasee had in mind serious consequences of the injury which became apparent after the release was given, and therefore there was a "mutual mistake of fact." [30]

Williston, realizing the desire of the courts to escape the objective theory in such cases, describes them as follows: "Thus, where a release is given by one injured in an accident and more serious injuries develop than were supposed to exist at the time of settlement, it is a question of fact whether the parties assumed as a basis of the release the known injuries, or whether the intent was to make a compromise for whatever injuries from the accident might exist whether known or not. On a fair interpretation not only of the language of the instrument, but of the intention of the parties, the latter position is more likely, but presumably *out of tenderness for injured plaintiffs some courts have gone very far* in accordance with the former possibility." [31]   (In the instant case, plaintiff's lawyer testified that he had received the report of a physician to the effect that plaintiff's injury was not serious. The evidence was, then, probably sufficient to bring this case within the mutual mistake rule; but I think the trial judge's instructions were such as not to leave that issue to the jury.)

Two approaches have been suggested which diverge from that of Williston and the Restatement but which perhaps come closer to the realities of business experience.   (1) The first utilizes the concept of an "assumption of risk": The parties to a contract, it is said, are presumed to undertake the risk that the facts upon the basis of which they entered into the contract might, within a certain margin, prove to be non-existent; accordingly, one who is mistaken about any such fact should not, absent a deliberate assumption by him of that risk, be held for more than the actual expenses caused by his conduct.   Other-

---

ence of kind or a difference of degree. The answer * * * is that it is a difference of degree. A difference of kind is merely a violent difference of degree."

[28a] Scheer v. Rockne Motors Corp., 2 Cir., 68 F.2d 942.

[29] Or an insurer of the employer.

[30] Some courts seem to intimate that, on such facts, there is the equivalent of "fraud." Cf. Restatement of Contracts, 503 comment a, which, in discussing "reason to know," refers to § 472(b) where lack of privilege of nondisclosure is discussed; § 471(c) defines "fraud" to include "nondisclosure where it is not privileged, by any person intending or expecting thereby to cause a mistake by another to exist or to continue, in order to induce the latter to enter into or refrain from entering into a transaction * * * * "

For federal cases, see, e.g., Robert Hind, Ltd., v. Sylva, 9 Cir., 75 F.2d 74, 77; Great Northern R. Co. v. Fowler, 9 Cir., 136 F. 118; Montgomery Ward & Co. v. Callahan, 10 Cir., 127 F.2d 32, 35; Southwest, etc., Co. v. Jones, 8 Cir., 87 F.2d 879, 881, 882; Atlantic Greyhound Lines v. Metz, 4 Cir., 70 F.2d 166, 168; Chicago, M., St. P. & P. R. Co. v. Bus-

by, 9 Cir., 41 F.2d 617, 619; Shook v. Illinois Cent. R. Co., 5 Cir., 115 F. 57.

For cases in divers state courts, see 59 A.L.R. 809; Rosenblum v. Manufacturers Trust Co., 270 N.Y. 79, 200 N.E. 587, 105 A.L.R. 950; Serr v. Biwabik Concrete Aggregate Co., 202 Minn. 165, 278 N.W. 355, 117 A.L.R. 1022; L.R.A. 1916B, 785.

See, as to release cases of divers kinds in New York, Dominicis v. United States Casualty Co., 132 App.Div. 553, 116 N.Y.S. 975; Harvey v. Georgia, 148 Misc. 633, 266 N.Y.S. 168, 170; Seidman v. New York Life Ins. Co., 162 Misc. 560, 296 N.Y.S. 55, 56; Landau v. Hertz, etc., Co., 237 App.Div. 141, 260 N.Y.S. 561; Le Francois v. Hobart College, Sup., 31 N.Y.S.2d 200, 202; Barry v. Lewis, 259 App.Div. 496, 20 N.Y.S.2d 88, 91. In Backhous v. Wagner, 234 N.Y. 429, 138 N.E. 82, there was no showing that the releasor turned out to be more seriously injured than he had supposed when he gave the release. In McNamara v. Eastman Kodak Co., 232 N.Y. 18, 133 N.E. 113, plaintiff had sworn to a petition to the surrogate which stated the nature of her claim and asked approval of the settlement, which the surrogate had given.

[31] § 1551. Emphasis added.

wise, the other party will receive a windfall to which he is not entitled.[32]   (2) The second suggestion runs thus: Business is conducted on the assumption that men who bargain are fully informed as to all vital facts about the transactions in which they engage; a contract based upon a mistake as to any such fact as would have deterred either of the parties from making it, had he known that fact, should therefore be set aside in order to prevent unjust enrichment to him who made the mistake; the other party, on this suggestion also, is entitled to no more than his actual expenses.[33]   Each of those suggestions may result in unfairness, if the other party reasonably believing that he has made a binding contract, has lost the benefit of other specific bargains available at that time but no longer open to him.[34]   But any such possibility of unfairness will seldom, if ever, exist in the case of a release of liability for personal injury whatever the nature of the mistake (i. e., whether it fits into one or the other of Williston's categories).

In short, the *"security of business transactions" does not require a uniform answer to the question when and to what extent the non-negligent use of words should give rise to rights in one who has reasonably relied on them.   That the answer should be favorable to the relier when the words are used in certain kinds of contracts, does not mean that it should also be when they are used in a release of a claim for personal injury; and there may be still further reasons for an unfavorable answer when the claim is by an employee against his employer.*

In all likelihood, it is because the courts have sensed the differentiated character of releases of personal injury claims that the "modern trend," as Wigmore describes it, "is to * * * develop a special doctrine * * * for that class of cases, liberally relieving the party who signed the release." [35]   Surely much is to be said for that liberality, especially in a case where an employee has given a release of personal injury liability, without the fullest comprehension of what he was about, for a relatively small sum which turns out to be wholly inadequate.

In the admiralty cases, such relief has long been accorded seamen; the courts, calling them "wards of admiralty," have regarded them, in many of their dealings with their employers, as necessitous persons, under strong economic pressures, who, because of their helplessness, are to be protected from hard bargains,[36] just as "equity," for similar reasons, protects mortgagors and beneficiaries of spendthrift trusts.   The usual non-maritime employees, because they are under similar economic pressures, are no less helpless in their trafficking with their employers.   It can truthfully be said of them what the admiralty decisions say of seamen: "They are," remarked Mr. Justice Story, "considered as placed under the dominion and influence of men, who have naturally acquired a mastery over them; and as they have little of the foresight and caution belonging to persons trained in other pursuits of life,[37] the most rigid scrutiny is instituted into the terms of every contract, in which they engage.   If there is any undue inequality in the terms, any disproportion in the bargain, any sacrifice of rights of one side which are not compensated by extraordinary benefits on the other, the judicial interpretation of the transaction is that the bargain is unjust and unreasonable, that advantage has been taken of the situation of the weaker party, and that pro tanto the bargain ought to be set aside as inequitable." [38]   To men like plaintiff here, the following comment about seamen fully applies: "They are * * * placed too much in the power of the owners [i. e., employ-

---

[32] See Note, 5 Un. of Chi.L.Rev. (1938) 446, 448; Sharp, Notes on Contract Problems and Comparative Law, 3 Un. of Chi.L.Rev. (1936) 277; Sharp, Williston on Contracts, 4 Un. of Chi.L. Rev. (1936) 30.   As to the "windfall," cf. Lord Sumner in Jones v. Waring, [1926] A. C. 670, 696.

[33] See citations in the preceding footnote.

[34] See Note, 5 Un. of Chi.L.Rev. (1938) at 449 and note 18.   Cf. Fuller and Perdue, loc. cit., passim; they suggest that that element in the theory of contracts is disclosed in the rule that the plaintiff must, after the defendant's breach, take steps to mitigate damages.

[35] Wigmore, Evidence § 2416.

[36] Garrett v. Moore McCormack Co., 317 U.S. 239, 63 S.Ct. 246, 87 L.Ed. 239; Hume v. Moore-McCormack Lines, 2 Cir., 121 F.2d 336.

[37] Note how aptly that description fits the plaintiff here.

[38] Harden v. Gordon, 1823, Fed.Cas.No. 6,047.

ers] to be able to negotiate with them on equal terms." [39]

It is not surprising, then, that many courts—although without such direct expressions as those which adorn the seaman cases—have in fact in the release cases. manifested, although obliquely, a not dissimilar guardianship of employees of large corporations. As already noted, the Supreme Court recently gave a broad hint that the admiralty doctrine is not as exceptional as is sometimes supposed; see Garrett v. Moore-McCormack Co., 317 U.S. 239, 248, 63 S.Ct. 246, 87 L.Ed. 239; note 17.[40] For reasons previously indicated, I think we should take that hint. It seems to me that the time has come to give up the elaboration of distinctions found in the judicial opinions relieving non-admiralty employees of their releases.[41] I believe that the courts should now say forthrightly that the judiciary regards the ordinary employee as one who needs and will receive the special protection of the courts when, for a small consideration, he has given a release after an injury. As Mr. Justice Holmes often urged, when an important issue of social policy arises, it should be candidly, not evasively, articulated.[42] In other contexts, the courts have openly acknowledged that the economic inequality between the ordinary employer and the ordinary individual employee usually means the absence of "free bargaining." [43] I think the courts should do so in these employee release cases.[44] And the federal

---

[39] The David Pratt, 1839, Fed.Cas.No. 3,597.

[40] See Hume v. Moore-McCormack Lines, supra, 121 F.2d at pages 337–346 for an attempt to discover the historic reasons for the differentiation made by the courts, during much of the 19th century, between seamen and other employees.

[41] As Patterson (28 Col.L.Rev. at 893) observes, "The courts have been quite willing to find fraud, innocent misrepresentation, or material mistake in these cases." They have indeed; they have found such facts, in the release cases, on very slight evidence, evidence which in many other types of cases they would consider insufficient. See, e.g., Miller v. Spokane International R. Co., 82 Wash. 170, 143 P. 981, 982; St. Louis-San Francisco R. Co. v. Cauthen, 112 Okl. 256, 241 P. 188, 48 A.L.R. 1462, 1517; Serr v. Biwabik Concrete Aggregate Co., 202 Minn. 165, 278 N.W. 355, 117 A.L.R. 1022, 1033ff.

And they have been quick, too, to seize on words in the releases in order to construe them most narrowly; Texas & P. R. Co. v. Dashiell, 198 U.S. 521, 527, 25 S.Ct. 737, 49 L.Ed. 1150; 48 A.L. R. at pages 1524, 1525; 117 A.L.R. at pages 1043–1045; L.R.A.1916B at pages 780, 781.

Patterson (loc.cit. 877) refers to the judicial use of "unconscionable" as an "emotive epithet."

[42] See, e.g., the following writings by Holmes: Common Carriers and The Common Law, 13 Am.L.Rev. (1879) 609, 630, 631; The Common Law (1881) 1, 5, 35, 36, 68, 116, 204, 205; The Path of The Law, 10 Harv.L.Rev. (1897) 457, 466, 467; Frankfurter, The Early Writings of O. W. Holmes, Jr., 44 Harv. L.Rev. (1931) 717, 719, 774, 779, 781,

note, 791; Vegelahn v. Guntner, 167 Mass. 92, 104, 106, 44 N.E. 1077, 35 L.R.A. 722, 57 Am.St.Rep. 443; Hudson County Water Co. v. McCarter, 209 U.S. 349, 355, 28 S.Ct. 529, 52 L.Ed. 828, 14 Ann.Cas. 560.

See also Pound, Interpretations of Legal History (1923) 60ff; Cohen, loc. cit., at 834.

[43] See, e.g., Chief Justice Taft in American Steel Foundries v. Tri-City Central Trades Council, 257 U.S. 184, 209, 42 S.Ct. 72, 66 L.Ed. 189, 27 A.L. R. 360; Chief Justice Hughes in National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 33, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352, and in Amalgamated Utility Workers v. Consolidated Edison Co., 309 U.S. 261, 263, 264, 60 S.Ct. 561, 84 L.Ed. 738. Cf. West Coast Hotel Co. v. Parrish, 300 U.S. 379, 393–397, 57 S.Ct. 578, 81 L.Ed. 703, 108 A.L.R. 1330; Holden v. Hardy, 169 U.S. 366, 397, 18 S.Ct. 383, 42 L.Ed. 780.

[44] It has been suggested that the courts should recognize the inequality of bargaining strength in connection with other kinds of releases of personal injuries given for comparatively small sums: "But it is believed that in many cases the individual tort claimant being solicited to release his claims is not in a position to defend his own interests even in the absence of coercive or fraudulent conduct on the part of his obligor, especially where that obligor is a powerful business organization, such as a railroad or insurance company. The prospect of a long and costly legal battle with such an opponent, often commanding almost unlimited resources, is enough to deter all but the most courageous or the most vindictive from taking action, especially where a tempting compromise settlement

courts, I think, should so hold in respect to liability pursuant to the Federal Employers' Liability Act.[45] I think, therefore, that we should treat the plaintiff here as we would if he were a seaman.[46]

Such a ruling will not produce legal uncertainty but will promote certainty—as anyone can see who reads the large number of cases in this field, with their numerous intricate methods of getting around the objective theory.[47] Such a ruling would simply do directly what many courts have been doing indirectly. It is fairly clear that they have felt, although they have not said, that employers should not, by such releases, rid themselves of obligations to injured employees, obligations which society at large will bear—either, by taxes, through the government or, by donations, through private charitable organizations.

3. The Pennsylvania Railroad Company warns us that, if a release given by an employee, advised by his own lawyer, is disregarded in a case like this, in the absence of fraud on the part of the employer, then employers will never hereafter settle with their employees who, to their grave disadvantage, will always in the future be forced to sue even for minor personal injury claims. That is a glib prediction based upon no evidence and intended to frighten the court. Sometimes judges have been persuaded by such prophecies which later events have shown to have been unfounded. So Choate, in Pollock v. Farmers' Loan & Trust Co., 1895, 157 U.S. 429, 532, 15 S.Ct. 673, 39 L.Ed. 759, seemingly alarmed the majority of the Court by his forecast that a federal income tax would usher in a communist regime in this country. And it is well to recall Lord Abinger's dire prediction when in 1837 he enunciated the fellow-servant rule which the Employers Liability Act has wiped out: "If the master be liable to the servant in this action, the principle of liability will be found to carry us to an alarming extent * * * The inconvenience, not to say the absurdity of these consequences, afford a sufficient

is offered in consideration of a release. It is conceivable that relief might be obtained in equity where gross inadequacy of benefits received or other circumstances render the agreement so unconscionable as to warrant equitable action."

Adoption judicially of such a doctrine is a bold step which I would hesitate to recommend that this court should take, although it does seem to be the unexpressed rationale of many decisions. See, e.g., Union Pac. R. Co. v. Harris, 158 U.S. 326, 15 S.Ct. 843, 39 L.Ed. 1003, and the comment thereon in Texas & P. R. Co. v. Dashiell, 198 U.S. 521, 529, 25 S.Ct. 737, 49 L.Ed. 1150, and in Garrett v. Moore-McCormack Co., 317 U.S. 239, 248, 63 S.Ct. 246, 87 L.Ed. 239, note 17.

[45] Duncan v. Thompson, 315 U.S. 1, 7, 62 S.Ct. 422, 86 L.Ed. 575, suggests that compromises of claims under that Act are to be most carefully scrutinized. Significant, too, is the citation of the Duncan case in Garrett v. Moore-McCormack Co., 317 U.S. 239, 248, 63 S.Ct. 246, 87 L.Ed. 239, note 17, where the court speaks of "cases involving releases for personal injuries arising from non-maritime torts" as "somewhat comparable" with cases involving releases of seamen's claims.

[46] Sitchon v. American Export Lines, 2 Cir., 113 F.2d 830, would not stand in the way; for in that case there was not the slightest evidence that plaintiff's lawyer mis-stated to him the nature of the release or that plaintiff did not thoroughly understand its meaning.

I am not unmindful that there is this seeming inconsistency in my position: I said above that legal rules, no matter how valuable the policy they embody, are often at the mercy of the fact-determinations in particular cases, and that those fact-determinations often involve ineradicable subjective factors; see In re J. P. Linahan, Inc., 2 Cir., 138 F.2d 650, 652, 653. The remedy for that defect lies, I think, in improved methods of fact finding; cf. United States v. Forness, 2 Cir., 125 F.2d 928, 942, 943. As improvement in fact-finding is slow in developing and, at best, cannot be a complete remedy, it might be argued that it is silly to bother about the legal rules. The answer, briefly, is that one should not be thoroughly defeatist as to the efficacy of legal rules. They frequently do play an important role, even if often not the controlling role, in litigation. Wherefore, the courts should strive to bring those rules (within the limits allowed by proper respect for stare decisis) into line with intelligent social policy.

[47] 59 A.L.R. 809; St. Louis-San Francisco R. Co. v. Cauthen, 112 Okl. 256, 241 P. 188, 48 A.L.R. 1462; Serr v. Biwabik Concrete Aggregate Co., 202 Minn. 165, 278 N.W. 355, 117 A.L.R. 1022; McIsaac v. McMurray, 77 N.H. 466, 93 A. 115, L.R.A.1916B, 776.

770

argument against the application of this principle to the present case * * * In fact, to allow this action to prevail would be an encouragement to the servant to omit that diligence and caution which he is in duty bound to exercise on the behalf of his masters, to protect him against the misconduct of others who serve him, and which diligence and caution, while they protect the master, are a much better security against any injury the servant may sustain by the negligence of others engaged under the same master, than any recourse against his master for damages could possibly afford." [48] Certainly, that prophecy went astray.

In New York, the rule as to releases is precisely that to which the Pennsylvania Railroad here objects; yet I venture to guess that thousands of settlements yearly are made in New York by employers who take the risk that, on a proper showing, the releases will be judicially disregarded.[49] Where the amount paid in settlement is relatively small, very likely most employers are willing to take such a risk.

One need not be highly imaginative or unduly cynical [50] to surmise that the Pennsylvania Railroad, in seeking here to be rid of a liability of $7,500 [51] to this employee for a payment of $750, is not too strongly motivated by a philanthropic regard for its other employees.

SWAN, Circuit Judge (dissenting).

As I understand Judge HAND'S opinion he differentiates between the case where a lawyer is engaged by an injured plaintiff to settle any and all claims arising out of the accident and the case where the lawyer is engaged to settle only a claim for loss of wages due to the accident; in the former case a release signed by the plaintiff will bind him even though the lawyer represented to him that it was only a receipt for wages, in the latter it will not. So far I agree with my brother. But I cannot agree to affirmance of the judgment on the ground that the jury found that the plaintiff engaged Mr. Reich under a limited retainer. I think that affirmance on this ground rests upon an issue not argued by the parties, not submitted to the jury and not supported by the evidence. It appears from the plaintiff's own testimony, as well as from Mr. Reich's, that after the latter was retained he caused the plaintiff to be examined by a doctor to ascertain the extent of his injuries. This seems wholly inconsistent with the present theory that Mr. Reich was to present to the defendant only a claim for wages and tips. When an injured employee engages his own attorney, and the latter has a doctor investigate the extent of the injuries, and then makes a complete settlement and gets his client to sign a release in full, that ought to end the matter, unless the employer practiced fraud on the attorney. In my opinion the judgment should be reversed and the cause remanded for a new trial in which the issue of what claims the attorney was authorized to settle shall be clearly submitted to the jury.

---

[48] Priestly v. Fowler, 1837, 3 M. & W. 1, 5.

[49] We know, from the cases, that shipowners have often made settlements for relatively small sums, procuring releases from seamen who were not advised by their own lawyers, despite the decisions that such settlements, on a proper showing, will be ignored by the courts. That goes to show that employers are willing to make such settlements in the face of the risk that they may be set aside.

[50] "Judges are apt to be naif, simpleminded men, and they need something of Mephistopheles." Holmes, Collected Legal Papers (1920) 295.

[51] In fact, the liability was for $7,500 plus $750, or $8,250, of which $750 was paid.