ERNA B. DOUD, TRUSTEE FOR HEIRS OF GEORGE DOUD,
v. MINNEAPOLIS STREET RAILWAY COMPANY.

107 N. W. (2d) 521.

February 3, 1961—No. 37,769.

*Meagher, Geer, Markham & Anderson, M. J. Coyne,* and *O. C. Adamson II,* for appellant.

*Minenko, Feinberg, Mirviss, Meyers & Schumacher,* for respondent.

MURPHY, JUSTICE.

This is an appeal by defendant from an order vacating and setting aside a settlement of claim of damage for injuries to a minor approved by order of court. The trial court found that the injury from which the minor died resulted from the accident involved and was separate and distinct from known injuries within the contemplation of the parties at the time contract for settlement was agreed upon. The defendant claims that the injury from which the minor died was an anticipated consequence of known injuries included in the contract for settlement.

On July 1, 1955, George Doud, then aged 16, was injured while he was riding as a passenger in an automobile which collided with a bus operated by the defendant, Minneapolis Street Railway Company. Following the accident he was admitted to the Minneapolis General Hospital, where he was treated for a contusion of the left kidney, lacerations of the face, neck, and left forearm, and fractures of the 5th rib on the left side and the 11th rib posteriorly on the left side. X-rays revealed the presence of a mass of fluid or hematoma in his left chest near the upper portion, caused by a hemorrhage. Part of this fluid was removed from his chest, and the residue in time became absorbed in his system. During the period of hospitalization, this condition was closely observed by frequent X-rays. It was noted that a cardiac mur-

mur developed a few days after the accident. A catheterization was performed which failed to reveal any deficiency in the heart itself and the doctors at no time found any condition in the heart which would account for the murmur.

The minor was released from General Hospital on August 10, 1955, after which he was readmitted from time to time as an outpatient for further examination. The chief of surgery at the hospital diagnosed the cause of the hematoma as a laceration or rupture of the aorta high in the chest. During the ensuing months, between August 1955 and November 1956, the minor was observed on a number of occasions at the hospital. By November 19, 1956, the hematoma had been absorbed "quite well." Prominence of an aortic node was observed during the summer of 1955 and was evident in examinations made in January 1956.

Seventeen months after the accident, on November 19, 1956, and before the commencement of trial, all claims for damages arising out of the accident were compromised and settled. The amount of the settlement was $3,745.50.

The settlement was approved by the court on petition of both the mother and son and on advice of their counsel. The petition was supported by the statement of the attending physician, Dr. J. M. Feeney. This statement did not contain any specific diagnosis. It appears from it, however, that George Doud was not reacting in a normal fashion to an exercise tolerance test. His physician stated that while there was still prominence of the aortic node, there was no evidence of congestion and "no other findings to suggest coarticulation of the aorta." Because the boy's pulse rate accelerated on slight exertion, Dr. Feeney expressed the view that he had not fully recovered from the injury.

In approving the settlement the court provided that the sum of $1,445.63 be deposited in a bank to the account of the minor until he reached his majority. The balance of the settlement went to payment of special items of damage, including attorney's fees.

After the settlement was made, the boy's condition deteriorated. Prior to his release from the hospital, Dr. Hitchcock, chief of surgery at General Hospital, had suspected the presence of a thoracic aneurysm,

which is described as a fibrous sac or "circular out-pouching of [the] aorta which is the main blood vessel carrying blood to the whole lower part of the body." This condition results in a lateral pressure upon the tissue surrounding the aortic artery and as the fibrous sac enlarges with time a rupture may follow causing death. There is no evidence that Dr. Hitchcock conveyed to Dr. Feeney his suspicions as to the existence of the thoracic aneurysm. From the medical testimony it appears that although the existence of the heart murmur and aortic node might be symptomatic of an aneurysm no such diagnosis was definitely made until the spring of 1957. It is not claimed that the mother had any knowledge of this condition at the time the settlement was made. It appears that it takes a considerable period of time for an aneurysm to develop and its presence cannot be actually determined without surgery.[1] When it was finally decided after consultation at General Hospital that it was probable that the aneurysm was the cause of the boy's failure to recover as expected, it was determined to perform surgery. On July 2, 1957, the boy was operated upon to remove the aneurysm and insert a blood vessel graft. Shortly after the operation, on August 14, 1957, as a result of infection the major vessel distal to the area of the graft ruptured causing the boy's death.

---

[1]With reference to the condition which caused the death of the patient, Dr. Hitchcock made the following statement: "When George began to improve and get well—ah—we impressed upon him the necessity of observation, close observation, and to see how things were going on, but we didn't tell them at that time that he was in dire circumstances of rupturing an aneurism because we were not absolutely sure at that point. We had to wait until this thing had developed to the point where we could be clinically sure that he was there. Now, the final proof of this sort of thing rests only in the opening of the chest at surgery and the demonstration that the lesion was there. We could clinically suspect it, you see, from our X-rays, but we can't be absolutely sure that that's what it is, so that is why we never come out flatfootedly and say, 'This man has a definite traumatic aneurism,' until we go in the chest and see it, feel it with our hands, take out any mass, and wait until you get it out in order to see. There is always a possibility, you see, that this could have been a fibroma and then our clinical impression would have been wrong, but as it was, our clinical impression that we had early in the year of '57 was borne out."

Following the boy's death, his mother obtained an order of the court permitting her, as special administratrix of his estate, to withdraw the balance of the settlement funds. It appears that special damages, including additional hospital and doctor bills, exceed the sum of $8,000. After her appointment as trustee for the heirs of her son, Mrs. Doud moved the court for an order vacating and setting aside the order approving the settlement made on November 19, 1956, and reinstating the case upon the calendar.

The motion was opposed by the defendant and, after a full hearing before the trial judge who had approved the settlement, an order was made vacating and setting aside the order of November 19, 1956. The court found that the death was caused by an aneurysm which was attributable to the accident. The trial court noted that one of the physicians who attended the boy was apparently not of the belief that the aneurysm might be present and that the mother who brought suit for the boy was not aware of it. The court found: "Medical reports did not inform her or her attorney that an aneurism existed." The trial court was of the view that under the circumstances Larson v. Stowe, 228 Minn. 216, 36 N. W. (2d) 601, 8 A. L. R. (2d) 455, controlled, and that the aneurysm was separable and distinct from the known conditions as they existed at the time of the settlement. He expressed the further view that medical opinion that the symptoms of damage to the aorta might indicate the development of an aneurysm should not be attributable to the mother, who had no knowledge of this fact when the settlement was entered into, and he applied the principle stated in the Larson case (228 Minn. 221, 36 N. W. [2d] 604):

"* * * Laymen cannot reasonably be expected to go beyond a physician's professional diagnosis in ascertaining a person's injuries."

The contract signed by both George and his mother, Erna Doud, acting individually and as his guardian, released the Minneapolis Street Railway Company from—

"* * * all liability, claims, suits, causes of action or demands arising out of and resulting from injuries, known and unknown and which may arise or become known in the future, together with all conse-

quences of known or unknown injuries whether such consequences are now anticipated or not, together with all other damage, loss or expense sustained or incurred or which may in the future be sustained or incurred on account of injuries, damage or loss arising out of the accident of July 1, 1955."

It is the contention of defendant that the court was in error in setting aside the release and settlement for the reason that the aneurysm was an anticipated consequence of the injury at the time the settlement was approved. It points out that the aneurysm was within the contemplation of the parties as expressed in the release by the words "known and unknown and which may arise or become known in the future, together with all consequences of known or unknown injuries whether such consequences are now anticipated or not, * * *."

It is well established in this state that where parties contract for a release of all claims for known injuries, the release is a bar to recovery for unknown consequences of known injuries. Such release, however, is not a bar to recovery for unknown injuries not within the contemplation of the parties at the time the release was contracted for. In Aronovitch v. Levy, 238 Minn. 237, 246, 56 N. W. (2d) 570, 576, 34 A. L. R. (2d) 1306, we said:

"* * * Further that, even though a release expressly covers unknown injuries, it is not a bar to an action for such unknown injuries if it can be shown that such unknown injuries were not within the contemplation of the parties when the settlement was agreed upon, but that, if the parties did in fact intentionally agree upon a settlement for unknown injuries, such release will be binding."

In Aronovitch v. Levy, *supra,* and Larson v. Stowe, 228 Minn. 216, 36 N. W. (2d) 601, we held that the issue as to whether the parties intended the release to cover unknown injuries is a fact question.

The determination of whether a mutual mistake of fact induced the settlement is not foreclosed by the express language of the contract for release. In the Larson case we said (228 Minn. 219, 36 N. W. [2d] 603):

"* * * Express language alone, wherever found, is not sufficient,

but must be coupled with the factual element of an existing intent to include unknown injuries. * * * The existence of injuries of such a character that reasonable parties could not have entered into the agreement except through error is an element that weighs heavily against the finality of all-inclusive language."

■ The judicial policy from which the foregoing rules derive, and which we think applies with particular force to the facts here, is well stated by the late Mr. Justice Matson in Larson v. Stowe, *supra,* in these words (228 Minn. 219, 36 N. W. [2d] 603):

"* * * In the case of prolonged disability from injuries, the compelling need for immediate cash provides an economic compulsion that may lead to hasty and improvident settlements, even though fraud and undue influence be wholly absent. It is submitted that by reason of the special interest of the public in preventing injured persons from unnecessarily becoming burdens upon society in consequence of their improvident settlement of injuries, the well-developed tendency of the law—which though acknowledged in practice is usually not acknowledged in name—is to adopt a more liberal rule for the setting aside of releases in these cases than otherwise obtains. In the case of a minor, who in fact is not possessed of unlimited contractual competence in his own right, justification for a more liberal rule is manifest."

We think that the trial court in examining the testimony presented to it was justified in setting aside its prior order approving the settlement on the ground of mutual mistake. The record supports the conclusion that the parties entered into the settlement and release for injuries which were known to them, including fractured ribs and laceration or bruise of the aorta. They did not have in mind that they were making settlement for a grave injury to the heart organs which might well be fatal. We said in the Larson case that the trial court may exercise a sound discretion (228 Minn. 220, 36 N. W. [2d] 603) "in looking behind the shield of phraseology" to determine what injuries the parties actually contemplated and considered when the settlement was made. We think the record supports the conclusion of the trial court that the aneurysm which caused the death of George Doud was

in fact a separate injury unknown to the injured boy or his mother at the time the release was executed.

■ As a further ground for reversal defendant suggests numerous problems which it says necessarily abate the cause of action and nullify the effect of the court's order setting aside the release. In addition to the asserted failure of the plaintiff to tender back the settlement money, it argues that the effect of the court's order is to revive an action already settled and dismissed by a litigant no longer living and convert it to an action for death by wrongful act. Such an action, it argues, may not be maintained because damages recoverable are not the same and conflicting rights of beneficiaries could arise. We do not consider these as valid objections to the court's order under the facts before us. They were not presented to or passed upon by the court below. The effect of the court's order was to set aside and vacate the stipulation for settlement and the order approving it and to reinstate the action on the calendar. We assume that in making its order the trial court had in mind that the matter would be continued to allow pleadings to be made and issues framed conformable to practice in actions brought under Minn. St. 573.02 for death by wrongful act. Section 573.02, subd. 1, provides in part:

"If an action for such injury was commenced by the decedent and not finally determined during his life, it may be continued by the trustee for recovery of such damages for the exclusive benefit of the surviving spouse and next of kin, proportionate to the pecuniary loss severally suffered by the death. The court on motion shall make an order allowing such continuance and directing pleadings to be made and issues framed as in actions began under this section."

Obviously, troublesome questions may arise, including the problem of restoration or tender of the consideration for the settlement. But these are matters which must depend for their solution in the first instance upon the discretionary judgment of the trial court.[2]

Affirmed.

---

[2]Marple v. Minneapolis & St. L. R. Co. 115 Minn. 262, 132 N. W. 333, Ann. Cas. 1912D, 1082; Rase v. Minneapolis, St. P. & S. S. M. Ry.

Co. 118 Minn. 437, 137 N. W. 176; Serr v. Biwabik Concrete Aggregate Co. 202 Minn. 165, 278 N. W. 355, 117 A. L. R. 1009; McGovern v. Lutz, 242 Minn. 397, 65 N. W. (2d) 637.